# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ADRIAN DIECKMAN, on behalf of himself and all others similarly situated,

Plaintiff,

v.

REGENCY GP LP and REGENCY GP LLC,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 11130-CB

## MEMORANDUM OPINION

Date Submitted: September 15, 2020
Date Decided: February 15, 2021

Christine M. Mackintosh, Vivek Upadhya, and Michael D. Bell, GRANT & EISENHOFER P.A., Wilmington, Delaware; Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, Wilmington, Delaware; Jeroen van Kwawegen and Edward G. Timlin, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; *Attorneys for Plaintiff and the Class.*

Rolin P. Bissell and Tammy L. Mercer, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Michael C. Holmes, John C. Wander, and Craig E. Zieminski, VINSON & ELKINS LLP, Dallas, Texas; *Attorneys for Defendants Regency GP LP and Regency GP LLC.*

**BOUCHARD, Chancellor**

This post-trial opinion resolves two claims brought on behalf of a class of limited partners of Regency Energy Partners LP against its general partner for breach of Regency's limited partnership agreement arising from a unit-for-unit merger pursuant to which Energy Transfer Partners L.P. ("ETP") acquired Regency for approximately $10 billion in a transaction that closed in April 2015 (the "Merger"). At the time of the Merger, Regency and ETP were both controlled by Energy Transfer Equity, L.P. ("ETE").

Before trial, the court granted plaintiff's motion for partial summary judgment that the transaction failed to satisfy two safe harbors in Regency's partnership agreement that, if either had applied, would have precluded judicial review of the Merger. The failure to satisfy both safe harbors stemmed from the same problem— the appointment of Richard Brannon to a conflicts committee of Regency's board while he was serving on the board of another entity controlled by ETE, Sunoco LP. That appointment violated a bright-line prohibition in Regency's partnership agreement delineating the qualifications to serve on the conflicts committee. Had Brannon resigned from the Sunoco board before joining Regency's conflicts committee, which was the plan, the prohibition would not have been violated. But implementation of the plan was badly mishandled.

At trial, plaintiff contended that the general partner breached an express provision of the partnership agreement requiring that the Merger be fair and

1

reasonable to the partnership and breached the implied covenant of good faith and fair dealing inherent in the partnership agreement. The latter claim focused mostly on Brannon's appointment to the conflicts committee. Relying on an expert who compared (i) the value of Regency's units based on a discounted cash flow analysis using a dividend discount model ("DDM") to (ii) the value of the Merger consideration (0.4124 of an ETP unit for each Regency unit) using ETP's closing stock price, plaintiff sought over $1.6 billion in damages.

For the reasons explained in detail below, having considered carefully a mountain of evidence presented during a five-day trial, the court finds that defendants are entitled to judgment in their favor.

There are many legal issues and factual questions addressed in this opinion, but three fundamental conclusions drive this outcome. First, notwithstanding the problems associated with Brannon's appointment to the conflicts committee, defendants demonstrated that the Merger was fair and reasonable to Regency and its unitholders. Second, plaintiff failed to prove that the general partner acted in bad faith or engaged in willful misconduct or fraud so as to avoid a provision in the partnership agreement exculpating the general partner from monetary damages. Third, plaintiff failed to prove damages. The apples-to-oranges analysis of plaintiff's valuation expert—comparing DDM-to-market—was unreliable and every DDM-to-DDM or market-to-market scenario yielded no damages.

2

# I. BACKGROUND

Prior decisions of this court and the Delaware Supreme Court discuss the background of this action.[1] The facts recited in this opinion are the court's findings based on the testimony and documentary evidence presented during a five-day trial. The record includes stipulations of fact in the Stipulated Joint Pretrial Order, over 1,300 trial exhibits, nineteen depositions, live testimony from nine fact and three expert witnesses, and video testimony presented at trial from two fact witnesses.

## A. The Players

Regency Energy Partners LP ("Regency," "RGP," or the "Partnership") was a Delaware master limited partnership whose units were listed and traded on the New York Stock Exchange until April 30, 2015.[2] Regency provided midstream services in the oil and gas industry.[3] "Midstream" is a broad term that encompasses all aspects of the energy value chain excluding the production of oil and gas (upstream) and the distribution to end markets (downstream).[4] Plaintiff Adrian Dieckman was a common unitholder of Regency.[5]

---

[1] *See Dieckman v. Regency GP LP*, 2016 WL 1223348 (Del. Ch. Mar. 29, 2016); *Dieckman v. Regency GP LP*, 155 A.3d 358 (Del. 2017); *Dieckman v. Regency GP LP*, 2018 WL 1006558 (Del. Ch. Feb. 28, 2018) (ORDER); *Dieckman v. Regency GP LP*, 2019 WL 4541460 (Del. Ch. Sept. 19, 2019) (ORDER) (clarifying February 28, 2018 order); *Dieckman v. Regency GP LP*, 2019 WL 5576886 (Del. Ch. Oct. 29, 2019).

[2] Stipulated Joint Pretrial Order ("PTO") ¶¶ 36-38 (Dkt. 288).

[3] *Id.* ¶ 41.

[4] JX 79 at 184.

3

Defendant Regency GP LP was a Delaware limited partnership that served as the general partner of Regency.[6] Defendant Regency GP LLC is a Delaware limited liability company that served as the general partner of Regency GP LP.[7] For simplicity, unless otherwise noted, this decision refers to Regency GP LP and Regency GP LLC together as the "General Partner" or "Defendants." The Defendants' governance documents vest the board of directors of Regency GP LLC (the "Board) with the authority to govern and manage Regency.[8]

Energy Transfer Partners L.P. (as defined above, "ETP") was a Delaware master limited partnership whose units were listed and traded on the New York Stock Exchange.[9] ETP transported oil, gas, and natural gas liquids.[10] In August 2014, ETP acquired the general partner of Sunoco LP ("Sunoco").[11]

---

[5] PTO ¶ 25.

[6] *Id.* ¶¶ 26-27.

[7] *Id.* ¶¶ 31-32.

[8] Article VI of the Amended and Restated Agreement of Limited Partnership of Regency GP LP provides, subject to certain exceptions not relevant here, that "all powers to control and manage the business and affairs of [Regency GP LP] shall be vested exclusively in [Regency GP LLC]." JX 26 at 118. Under Section 7.1(c) of the Amended and Restated Limited Liability Agreement of Regency GP LLC, the sole member of Regency GP LLC, subject to certain limitations not relevant here, "delegated . . . to the Board of Directors of [Regency GP LLC] (the "*Board*") . . . all of [Regency GP LLC's] power and authority to manage and control the business and affairs of [Regency]." Defs.' Supp. Br. Ex. 6 § 7.1(c) (Dkt. 321).

[9] PTO ¶¶ 42-43.

[10] *Id.* ¶ 45.

[11] *Id.* ¶ 46.

4

Energy Transfer Equity, L.P. ("Energy Transfer" or, as defined above, "ETE") is a Delaware master limited partnership that indirectly owned the General Partner of Regency and the general partner of ETP ("EGP").[12] At all relevant times, ETE held controlling ownership interests in Regency, ETP, and Sunoco, directly or indirectly, and held 100% of the incentive distribution rights ("IDRs") in Regency, ETP, and Sunoco.[13] ETE's primary revenues came from IDR distributions from its affiliated master limited partnerships ("MLPs").[14]

Kelcy Warren was the CEO and chairman of the board of EGP, and was the chairman of the board and majority owner of ETE's general partner, LE GP, LLC, the "governing body" of the Energy Transfer family of MLPs.[15] Through his control of LE GP, LLC, Warren had the power to remove or appoint directors on the boards of ETP, Sunoco, and Regency.[16] As of January 2015, Warren held, directly or indirectly, approximately 91.6 million ETE units.[17] After the Merger, Warren remained CEO and Chairman of the general partner of ETE's successor company,

---

[12] *Id.* ¶¶ 39, 44, 48.

[13] *Id.* ¶¶ 40, 44, 51.

[14] Tr. 1292 (Warren); JX 670 at 46, 102.

[15] PTO ¶¶ 55-56; JX 670 at 7, 138; Tr. 1284 (Warren).

[16] Tr. 1283-84, 1287 (Warren).

[17] Tr. 1321-22 (Warren); JX 1009.

Energy Transfer LP.[18]  As of 2014-2015, the Energy Transfer family of MLPs had over 27,000 employees.[19]

The following organizational chart depicts the ownership relationships among the Energy Transfer family of MLPs before the Merger, along with the status of Regency after the Merger:



---

[18] PTO ¶ 56.

[19] Tr. 1281-84 (Warren).

### B. Regency's Business

Regency provided midstream services in the oil and gas industry.[20] It owned and operated pipelines that gathered, processed, and transported natural gas and natural gas liquids ("NGLs") downstream towards transportation hubs, refineries, and the ultimate consumers.[21] Its operations were concentrated in "Arklatex" (Arkansas, North Louisiana, and East Texas), the mid-continent region (North Texas, Kansas, Colorado, and Oklahoma), South Texas, Permian, and Eastern (Pennsylvania, West Virginia, and Ohio).[22] Regency had six business segments: (i) gathering and processing ("G&P"), (ii) natural gas transportation, (iii) contract services, (iv) NGL services, (v) natural resources, and (vi) corporate.[23] As measured by EBITDA contribution, G&P was Regency's largest business segment, comprising more than 60% of its 2014 total adjusted EBITDA:[24]

| Segment | EBITDA (thousands) | Contribution % |
|---|---|---|
| Gathering & Processing (G&P) | 779,946 | 61.27% |
| Natural Gas Transportation | 160,444 | 12.60% |
| NGL Services | 150,654 | 11.83% |
| Contract Services | 148,254 | 11.64% |
| Natural Resources Segment | 63,812 | 5.01% |
| Corporate | (30,317) | -2.38% |
| **Total** | 1,272,793 | 100% |

---

[20] PTO ¶ 41.

[21] *Id.*

[22] *Id.* ¶ 216; JX 839 ¶¶ 19-20.

[23] PTO ¶ 202.

[24] JX 396.

G&P involves transporting raw natural gas from the wellhead to gas processing facilities, where NGLs are removed from the natural gas stream, and selling the NGLs and natural gas into the market.[25] G&P is considered among the most-commodity sensitive of any midstream segment "for two main reasons: contract structures and direct leverage to production volumes."[26] G&P contracts generally are structured so that during the processing phase, the company keeps NGLs as payment for processing services, which "in comparison to a wholly fee-based contract structure, exposes G&P companies to direct commodity-price risk."[27] Regency's G&P adjusted segment margin is based in part on natural gas and NGL prices.[28] Drilling slowdowns due to lower prices also would negatively impact G&P production volumes.[29]

Regency's natural gas transportation segment provided services on Regency's two interstate and one intrastate pipeline.[30] The contract services segment provided natural gas compression and treating services.[31] The NGL services segment

---

[25] JX 839 ¶¶ 19, 84; JX 667 at 77; PTO ¶ 203.

[26] JX 260 at 5.

[27] *Id.*

[28] JX 667 at 78.

[29] JX 260 at 5.

[30] JX 839 ¶ 19.

[31] *Id.*; JX 667 at 77; PTO ¶ 208.

provided transportation, fractionation, and storage of natural gas liquids.[32] The natural resources segment managed coal and natural resource properties.[33] The corporate segment was comprised of its corporate assets.[34]

In 2013 and 2014, many G&P MLPs expanded via growth and acquisition projects because of favorable commodity prices.[35] During this period, Regency completed approximately $9 billion in capital acquisitions and its corporate debt was rated below investment grade by Standard & Poor's and Moody's.[36] In 2014, Regency raised capital by completing a $400 million at-the-market equity issuance, and on January 8, 2015, the Company announced a $1 billion at-the-market equity issuance program.[37]

## C. ETP's Business

ETP processed, stored, and transported oil and gas through pipelines, and operated a retail marketing segment.[38] It had seven business segments: (i) intrastate transportation and storage, (ii) interstate transportation and storage, (iii) midstream, (iv) liquids transportation and services, (v) retail marketing, (vi) Sunoco logistics,

---

[32] JX 839 ¶ 19; JX 667 at 77; PTO ¶ 207.

[33] JX 839 ¶ 19; JX 667 at 77; *see* JX 608 at 13; PTO ¶ 209.

[34] PTO ¶ 210.

[35] JX 133 at 6-8.

[36] PTO ¶¶ 175, 177-78, 211.

[37] *Id*. ¶¶ 194-95.

[38] JX 839 ¶ 22.

9

and (vii) other.[39]  Unlike Regency, the EBITDA contribution from ETP's business segments was more evenly distributed:[40]

| Segment | EBITDA (millions) | Contribution % |
|---|---|---|
| Interstate Transportation and Storage | 1,110 | 22.98% |
| Sunoco Logistics | 971 | 20.10% |
| Retail Marketing | 731 | 15.13% |
| Midstream | 608 | 12.59% |
| Liquids Transportation and Services | 591 | 12.22% |
| Intrastate Transportation and Storage | 500 | 10.35% |
| Other | 318 | 6.58% |
| **Total** | 4,829 | 100% |

ETP's main business segments did not rely heavily on high commodity prices and its retail business was countercyclical to declining energy prices.[41]  ETP had an investment grade credit rating at all times relevant to this action.[42]

### D. Regency and ETP's Incentive Distribution Rights

An MLP's partnership agreement delineates the percentage of total cash distributions to be allocated between the general partner and limited partners.[43]  Most MLPs, including Regency and ETP, offer a class of distributions known as incentive

---

[39] JX 671 at 13-16, 80.

[40] *Id.* at 80.

[41] JX 79 at 16, 115, 117; JX 281 at 6.

[42] Tr. 387 (Canessa); JX 842 ¶ 145, Ex. 11B; JX 260 at 6 (investment grade, large cap MLPs such as ETP better insulated from a commodity backdrop).

[43] JX 79 at 24.

distribution rights (as defined above, "IDRs").[44]  IDRs, which are typically owned by the general partner, entitle the general partner to receive increasing percentages of the incremental cash flow as an MLP increases distributions to limited partners.[45] Put differently, through its ownership of IDRs, the general partner receives an increasing percentage of the "split" of incremental distributions as the aggregate amount of distributions increase.  This structure is intended to incentivize general partners to grow distributions to the limited partners through the pursuit of income-producing organic growth projects or strategic acquisitions.[46]

Access to capital is critical to growing distributions in an MLP because organic investments and acquisitions usually are funded with external capital in the form of new debt or equity.[47]  This is due to the fact that MLPs typically distribute most of their cash flows each quarter.[48]

From the first quarter of 2012 to the fourth quarter of 2014, Regency's quarterly distributions grew from 46 cents to 50.25 cents per common unit.[49]  The 50.25 cent distribution was in the fourth tier of the distribution schedule in

---

[44] JX 839 ¶ 25.

[45] *Id.*; JX 79 at 24.

[46] JX 839 ¶ 25; Tr. 15 (O'Loughlin).

[47] JX 79 at 28.

[48] *Id.*

[49] JX 667 at 64.

Regency's partnership agreement (the "LP Agreement"), which entitled ETE—the holder of the IDRs—to receive 23% of Regency's incremental distributions above 43.75 cents per unit quarter until each common unit received 52.50 cents for that quarter.[50] On a blended basis, taking into account the sum of all cash distributed across all tiers, when Regency paid a 50.25 cent distribution to the Regency unitholders, ETE and the limited partners received approximately 6% and 94%, respectively, of the total distribution.[51] The fifth and final tier of Regency's IDR schedule, which would be triggered when unitholders receive more than 52.50 cents per unit for the quarter—or just 2.25 cents per unit more than Regency paid out in the fourth quarter of 2014—entitled ETE to receive 48% of Regency's incremental distributions.[52]

During the same period, from the first quarter of 2012 to the fourth quarter of 2014, ETP's quarterly distributions grew from 89.38 cents to 99.50 cents per unit.[53] A distribution of 99.50 cents was in the fifth and final tier of the IDR schedule in

---

[50] JX 667 at 66; Tr. 16-18 (O'Loughlin).

[51] Tr. 18-20 (O'Loughlin).

[52] JX 667 at 66. Under the first and second tiers of the distribution schedule, all unitholders and the General Partner received distributions *pro rata* in accordance with their percentage interests and the IDR holders received nothing until each unitholder received a total of 40.25 cents per unit for that quarter. *Id.* at 64. Under the third tier, the IDR holders received 13% of the distributions above 40.25 per unit until each unitholder received 43.75 cents per unit for that quarter. *Id.* at 66.

[53] JX 671 at 114.

ETP's partnership agreement, which entitled the IDRs—all of which were held by ETE—to receive 48% of ETP's incremental distribution above 41.25 cents per unit for the quarter.[54] On a blended basis, taking into account the sum of all cash distributed across all tiers, when ETP paid a 99.50 cent distribution to the common unitholders, ETE and the limited partners received approximately 37% and 63%, respectively, of the total distribution.[55]

As a result of the Merger, the cash flows of the combined entity were run through the IDR schedule in ETP's partnership agreement.[56] This meant that Regency's cash flows likely would be distributed to ETE through the fifth tier of its distribution schedule at the 48%-level,[57] and would be accretive to ETE.[58] Referring to ETE's cut on a blended basis, analysts recognized that ETE "wins" in the Merger as "RGP's 7% GP take rolls into ETP's 38%."[59]

---

[54] *Id.* at 72. Under the first and second tiers of the distribution schedule, all unitholders and the General Partner received distributions in accordance with their percentage interests and the IDR holders received nothing until each common unitholder received a total of 27.50 cents per unit for that quarter. *Id.* at 72. Under the third tier, the IDR holders received 13% of the distributions above 27.50 cents per common until each common unitholder received 31.75 cents per unit for that quarter. *Id.* Under the fourth tier, the IDR holders received 23% of the distributions above 31.75 cents per common until each common unitholder received 41.25 cents per unit for that quarter. *Id.*

[55] Tr. 21 (O'Loughlin).

[56] Tr. 22 (O'Loughlin).

[57] Tr. 32-33 (O'Loughlin); JX 368 at 5.

[58] Tr. 1317 (Warren).

[59] JX 581 at 13.

### E. ETE Explores Integrating Its Partnership Structure

In October 2014, in response to market indications that ETE's partnership structure was "too complicated" and that "IDRs were no longer sustainable," Warren began to explore integrating the different partnerships within the ETE family.[60] At an ETP board meeting held on October 21, 2014, Jamie Welch, ETE's CFO, "advised that management was considering a series of transactions among ETE, ETP, SXL [Sunoco Logistics Partners L.P.], and RGP [Regency] in order to simplify the overall structure of the partnership family."[61]

### F. The OPEC Announcement and Energy Market Collapse

On November 27, 2014, the Organization of the Petroleum Exporting Countries ("OPEC") announced it would not stabilize oil prices by reducing production.[62] The OPEC announcement was a "watershed" moment and part of "one of the largest oil-price shocks in modern history."[63] The Wall Street Journal reported that it sent crude oil prices into a "tailspin."[64] A Morgan Stanley analyst report stated that the OPEC announcement threw "the industry and its customers . . . into a violent

---

[60] Tr. 1289, 1292 (Warren).

[61] JX 197 at 4; *see also* JX 670 at 350; JX 555 at 9; PTO ¶ 84.

[62] Tr. 493-94 (Bradley); Tr. 952 (Bryant); Tr. 55 (O'Loughlin).

[63] JX 255 at 2; JX 787 at 3.

[64] JX 255 at 1.

and challenging operating environment."[65]  A Bank of America Merrill Lynch analyst report stated that its strategists believed that "OPEC is now effectively dissolved and oil markets can expect sharper declines and more volatility."[66]

The OPEC announcement indicated that OPEC had opted to maintain market share through sustained lower prices.[67]  Oil prices declined by over 10% in the two days after the announcement and by nearly 40% between the OPEC announcement and the announcement of the Merger on January 26, 2015.[68]  During the six months preceding the Merger announcement, natural gas and NGL prices dropped by approximately 25% and 50%, respectively.[69]  Oil and gas producers in the United States responded to these price declines by curtailing new drilling.[70]  During the six months after the OPEC announcement, the number of drilling rigs in several regions relevant to Regency declined about 50%.[71]

Regency was particularly exposed to the decline.  Its largest business segment, G&P, was highly commodity-sensitive because its revenues are tied to oil and gas

---

[65] JX 354 at 45.

[66] JX 260 at 1.

[67] JX 210 at 1.

[68] JX 854 at 2; JX 308 at 13-17.

[69] JX 855 at 1; JX 919 at 1.

[70] JX 918 at 1-2.

[71] *Id.*

15

prices and its operators are left exposed if producers reduce drilling.[72] Regency's unit price declined by 18.3% in the first nine trading days following OPEC's announcement.[73] When Regency management saw declines in their PVR and Eagle Rock businesses, they commissioned a report.[74] It showed many producers had decreased drilling, which increased pressure on Regency's volume growth.[75]

In December 2014, about two weeks after the OPEC announcement, Welch told energy analysts during a Wells Fargo energy symposium dinner that Regency was "exposed to lower NGL prices and volumes;" may have a distribution coverage ratio "below 1.0x in 2015;" and might cut its "distribution growth."[76] On December 11, 2014, Wells Fargo published Welch's comments in a research report, where it commented that consolidation of RGP and ETP did not "make sense right now" because ETP was in a strong financial position and a merger with Regency would dilute ETP's "growth story and balance sheet."[77] That day, Regency's unit price declined 2.39%, from $24.30 to $23.72.[78]

---

[72] JX 79 at 125.

[73] JX 842 at Table 1.

[74] Tr. 515 (Bradley).

[75] Tr. 514-15 (Bradley); JX 590 at 68, 75.

[76] JX 282 at 4.

[77] *Id.*; JX 287 at 2.

[78] PTO Ex. A (Dkt. 265).

Welch's comments violated Regency's policy against providing forward guidance, were not authorized by ETE/ETP or Regency, and contributed to the subsequent termination of his employment when efforts to "muzzle" him failed.[79] Michael Bradley, Regency's CEO, was infuriated by Welch's comments and told him the day the comments became public that they were "[t]otally inappropriate."[80] Bradley lamented in a contemporaneous email that "[e]very conference we go to we deal with the same issues"[81] and credibly attributed Welch's remarks to the fact that Welch "liked to talk."[82]

## G. ETE Makes a Merger Proposal to Acquire Regency

On January 8, 2015, Welch asked Barclays to "look at" ETP buying Regency, and on January 12, Welch sent Barclays' analysis to Warren.[83] The analysis showed that a merger between Regency and ETP would result in "tremendous accretion" to ETE, and that the deal was "self-explanatory to ETE."[84]

On January 16, 2015, after the ETE and ETP boards held a joint meeting to approve ETP making an offer to acquire Regency, ETP made its first formal proposal

---

[79] Tr. 542-44 (Bradley); Tr. 1313-14 (Warren); JX 287: JX 290.

[80] PTO ¶ 59; Tr. 542-43 (Bradley); JX 287 at 1-3.

[81] JX 287 at 1.

[82] Tr. 543-44, 660-61 (Bradley).

[83] JX 329 at 1; JX 338 at 1.

[84] JX 338 at 1.

to acquire Regency in a unit-for unit transaction (0.4044 of an ETP unit for each Regency unit) valued at approximately $10.1 billion and a one-time cash make-whole payment of approximately $137 million or $0.36 per Regency unit.[85] The purpose of the make-whole payment was to offset the dilution in distributions Regency unitholders would receive in 2016 after the Merger closed.[86] The offer also included a $300 million ($60 million per year for five years) IDR "giveback" to benefit the post-Merger entity.[87]

Later in the day on January 16, Warren met with Tom Long (Regency's CFO) and Bradley to deliver ETP's merger proposal.[88] At that meeting, Warren asked Long if he would be interested in serving as CFO of the combined company.[89] Warren also informed Bradley that there may be a role for him at ETE post-Merger and to work on the Merger "quietly and quickly."[90]

### H. The Regency Conflicts Committee

After receiving ETP's merger proposal, Regency's Board met at 2:00 p.m. on January 16 and tasked its standing conflicts committee to evaluate the proposal and

---

[85] PTO ¶¶ 98-100; JX 359 at 11.

[86] JX 517 at 5.

[87] JX 359 at 1.

[88] Tr. 578 (Bradley); Tr. 1088-89 (Long); PTO ¶ 80.

[89] Tr. 1042 (Long); Tr. 578 (Bradley).

[90] JX 833 at 298-99 (Bradley Dep.); *see also* Tr. 579 (Bradley).

to report back to the Board (the "Conflicts Committee").[91]  The Board then consisted of Bradley, James Bryant, Rodney Gray, John McReynolds, and Matthew Ramsey.[92]  The Conflicts Committee then consisted of Bryant and Gray.[93]

The Board recently had determined it needed to replace Gray on its Audit & Risk Committee and its Conflicts Committee because he had become the CFO of a customer that represented a "tiny piece of Regency's business."[94]  This meant that Gray likely would not meet the definition of independence under the New York Stock Exchange rules,[95] which was one of the requirements for service on the Conflicts Committee under the LP Agreement.[96]  To address this issue, the Board decided on January 16 that Richard Brannon, who was then serving on the Sunoco board but would be nominated to the Regency Board by ETE, should replace Gray on the Conflicts Committee.[97]  After the January 16 Board meeting, Long contacted

---

[91] PTO ¶ 101; Tr. 874 (Brannon); JX 364 at 1.

[92] JX 364 at 1.

[93] *Id*.; Tr. 874 (Brannon).

[94] Tr. 552 (Bradley); JX 364 at 1.

[95] JX 815 at 93-94 (Gray Dep.).

[96] As discussed below, the LP Agreement required that Conflicts Committee members had to, among other things, "meet the independence standards of directors who serve on an audit committee of a board of directors established by . . . the National Securities Exchange on which the Common Units are listed or admitted to trading." JX 25 ("LPA") § 1.1.

[97] JX 364 at 1; PTO ¶ 96.

a representative of J.P. Morgan Securities, LLC ("J.P. Morgan") about potentially serving as a financial advisor to the Conflicts Committee.[98]

At 4:44 p.m. on Saturday, January 17, 2015, Jaclyn Thompson, Regency's Corporate Counsel, circulated to the directors by email a written consent dated January 16, 2015 for their "review and approval" to appoint Brannon as a director of Regency and as a member of the Conflicts Committee to replace Gray, who had notified the Board of his resignation from the Conflicts Committee.[99] Later on January 17, four of the five directors—Bryant, Bradley, McReynolds, and Ramsey—approved the written consent.[100] The Conflicts Committee then consisted of Bryant and Brannon.[101]

During the weekend of January 17-18 when the written consent appointing Brannon to the Conflicts Committee was approved, Brannon spoke to Tom Mason, ETE's General Counsel. Brannon offered to resign from the Sunoco board at that time but Mason told him to "hold on" because ETE was not "100 percent sure this transaction is moving forward" and that he would "get back to [Brannon] if and when we need [Brannon] to resign."[102] Simultaneously serving on the Sunoco board was

---

[98] PTO ¶ 102.

[99] JX 373 at 1, 3-4.

[100] JX 378; JX 379; JX 380.

[101] PTO ¶ 95; *see* JX 406 at 1; Tr. 874 (Brannon).

[102] Tr. 870-71 (Brannon) (internal quotation marks omitted).

not permitted under the LP Agreement,[103] which required that the "Conflicts Committee" be "composed entirely of two or more directors who are *not* . . . officers, directors, or employees of any Affiliates of the General Partner."[104]

On the morning of January 20, after Mason contacted Brannon and told him the merger negotiations were moving forward, Brannon sent Mason a copy of a signed letter of resignation from the Sunoco board.[105]  At Mason's direction, Brannon sent the letter only to Mason as the "general counsel of the family of companies" and believed that he did not need "to do anything more" to resign from the Sunoco board.[106]  Brannon's belief was incorrect because, under Sunoco's governance documents, a notice of resignation from the Sunoco board does not become effective until the Sunoco board receives the notice.[107]  It is not clear precisely when Brannon's resignation from the Sunoco board became effective, but it appears the Sunoco board did not receive his resignation letter until after the

---

[103] *Dieckman*, 2019 WL 5576886, at *8-11.

[104] LPA § 1.1 (emphasis added).  Defendants do not dispute that Sunoco was an "Affiliate" of the General Partner when the Conflicts Committee was evaluating the Merger. *Dieckman*, 2019 WL 5576886, at *9.

[105] Tr. 765-66, 879-80 (Brannon); JX 600.

[106] Tr. 766, 882 (Brannon).

[107] JX 53 § 5.3 ("Any Director may resign at any time by giving written notice of such Director's resignation to the Board.  Any such resignation shall take effect at the time the Board receives such notice or at any later effective time specified in such notice.").

Regency Board approved the Merger on January 25, 2020[108] and by no later than January 30, 2015, when another person was appointed to replace Brannon on the Sunoco board.[109]

## I. The Merger Negotiations

On January 19, 2015, the Conflicts Committee participated in a conference call with its primary counsel (Akin Gump Strauss Hauer & Feld LLP) and Regency management to discuss the "logistics" of the Merger.[110] That same day, Todd Carpenter, Regency's general counsel, emailed the Conflicts Committee copies of a draft merger agreement prepared by ETP's counsel (Latham & Watkins LLP) and a summary of the agreement prepared by Regency's counsel (Baker Botts L.L.P.).[111]

---

[108] This conclusion follows from the following sequence of events. On January 23, 2015, the Chairman of Sunoco's board (Sam Susser) sent an email to Brannon and several other individuals who were on the Sunoco board inquiring about their availability for a potential Sunoco board call. JX 489; JX 666 at 54; Tr. 881 (Brannon). Brannon did not respond to the email to let the Sunoco board know he had resigned in order to "prevent any leaks" concerning the ETP-Regency merger negotiations. Tr. 881-82 (Brannon). On the evening of January 25, after the Conflicts Committee and the Regency Board had approved the Merger, Brannon sent an email to McReynolds and Mason seeking confirmation that someone had informed Susser about his resignation. JX 542; Tr. 883-84 (Brannon). McReynolds responded that he did not know; Mason responded that whether Brannon would return to the Sunoco board "was left open" and that someone should call Susser but to wait until the press release announcing the Merger went out the next morning. JX 542. On January 26, Brannon called Susser "to make sure he knew that [he] was not able to tell [Sunoco] in advance for all the obvious reasons" about his resignation from the Sunoco board. JX 564.

[109] JX 613 at 3.

[110] Tr. 873, 876 (Brannon); PTO ¶¶ 90, 103-05; JX 398.

[111] JX 397; JX 399; PTO ¶¶ 92-93, 104.

22

Also on January 19, Long provided J.P. Morgan with nonpublic, two-year financial projections for Regency.[112]

On January 20, the Conflicts Committee met at 2:00 p.m. to discuss its duties and responsibilities, and the retention of a financial advisor.[113] At 4:00 p.m., the Conflicts Committee interviewed representatives of J.P. Morgan via telephone and, shortly after the call, decided to retain J.P. Morgan, believing "it would be advantageous to engage a financial advisor with significant resources" because the transaction "would require a complicated analysis and likely would need to be completed in an expedited manner due to the market conditions of the industry, the financial and operational position of the Partnership and confidentiality concerns."[114] J.P. Morgan, which had been contacted several days earlier about the prospect of working for the Conflicts Committee, had assembled a team of around eleven bankers to "work basically around the clock" on diligence analysis.[115] At 6:00 p.m., the Regency Conflicts Committee participated by phone in a due diligence meeting with ETP during which the participants reviewed an extensive analysis of ETP's business that had been presented to analysts on November 18, 2014.[116]

---

[112] PTO ¶ 105.

[113] *Id.* ¶ 106.

[114] *Id.* ¶ 107-08; JX 406 at 2, 5.

[115] Tr. 702-05, 719-20 (Castaldo).

[116] JX 406 at 5; JX 925; Tr. 905-910 (Brannon).

On January 21, the Conflicts Committee flew to Lajitas, Texas, a resort Warren owned, where all the parties necessary to negotiate a transaction had been told to congregate to facilitate the discussions and to preserve confidentiality.[117] At noon that day, the Conflicts Committee met with Akin Gump attorneys to discuss potential changes to the draft merger agreement.[118]

At 3:00 p.m. on January 21, the Conflicts Committee participated in a due diligence call, which Bradley, Long, and Carpenter began by providing an overview of Regency and which included a discussion of its business segments, commodity exposure, growth plans, and financing requirements.[119] As part of the presentation, Regency management used a publicly-available investor relations slide deck, which had been used at a Wells Fargo conference in December 2014.[120] During the meeting, management discussed the outlook in the regions in which Regency operated, its proposed capital budget and future projects, and the risks associated with Regency's major contracts.[121] Management commented that, while Regency's fourth quarter numbers had not been finalized, they "expected distributable cash flow for 2014 to be below Wall Street consensus" and that the "Partnership would

---

[117] PTO ¶ 111; JX 364 at 1; Tr. 550-51 (Bradley).

[118] PTO ¶ 112; JX 436 at 1-2.

[119] PTO ¶ 114; JX 436 at 3.

[120] PTO ¶ 114.

[121] JX 436 at 4.

24

likely need to borrow in the first quarter of 2015 to make its intended distributions."[122]

On January 22, the Conflicts Committee met with Akin Gump attorneys, and discussed, among other things, the required unitholder vote to consummate the Merger and the level of the break-up fee in the draft agreement.[123] At the end of the meeting, the Conflicts Committee approved and authorized the execution of an engagement letter with J.P. Morgan.[124]

On the night of January 22, J.P. Morgan presented to the Conflicts Committee an overview of ETP's January 16 offer, *i.e.*, 0.4044 ETP units plus $0.36 in cash per Regency common unit.[125] The presentation included an overview of financial projections and assumptions relating to Regency that its management had provided, a comparison of the projections to analyst estimates, a summary of J.P. Morgan's valuation of the equity and cash consideration of ETP's offer, and its valuation of ETP.[126] After reviewing a sensitivity analysis of the valuation of the proposed transaction, J.P. Morgan commented that "the contemplated consideration to be paid

---

[122] *Id.*

[123] JX 454 at 1-2.

[124] *Id.*; PTO ¶ 120.

[125] PTO ¶ 126; JX 454 at 3.

[126] JX 454 at 3.

to the unaffiliated unitholders of the Partnership appeared to be fair based upon J.P. Morgan's initial analyses."[127]

After the Conflicts Committee discussed J.P. Morgan's presentation, it "determined that it believed the financial terms of the [Merger] were fair to the unaffiliated unitholders of the Partnership, especially when considering, among other things, the current commodity price environment, the Partnership's high leverage and high cost of capital to fund future growth, limitations on its growth due to such high cost of capital, and the expected decline in its distribution coverage ratio."[128] The Conflicts Committee then decided to make a counter-proposal to ETP consisting of a 0.425 exchange ratio and a two-year make-whole cash payment, *i.e.*, "a cash payment equal to the expected difference between ETP's quarterly distributions and Regency's quarterly distributions for a period of two years following the closing[,] as adjusted for the exchange ratio."[129] Later that night, the Conflicts Committee met with ETE's general counsel (Mason) to convey the counter-proposal.[130]

---

[127] *Id.*

[128] *Id.* at 1-2.

[129] *Id.* at 2; JX 682 ("Proxy") at 65.

[130] PTO ¶ 127; Proxy at 65.

On January 23, at 8:30 a.m., ETP's conflicts committee met and rejected Regency's counter-proposal.[131] ETP's conflicts committee then approved its own counter-proposal, which consisted of two options: (i) an exchange ratio of 0.4044 plus a one-year make-whole cash payment; or (ii) an exchange ratio of 0.3999 plus a two-year make-whole payment.[132]

Around mid-day, the Regency Conflicts Committee met and counter-proposed to ETP an exchange ratio of 0.4088, representing a 15% premium to Regency unitholders, plus a one-year make-whole cash payment.[133] As the Conflicts Committee awaited ETP's response,[134] Brannon received Regency's Q4 preliminary financial results from Bradley and Long, which were "not pretty."[135] The preliminary results showed a projected coverage ratio for a fourth quarter distribution of approximately .80x and December distributable cash flow 54% below budget.[136] The results told Brannon that "the fourth quarter was deteriorating at a much faster rate than we anticipated" and that Regency would have to borrow money to maintain its distribution for the quarter.[137]

---

[131] PTO ¶ 130; Proxy at 65.

[132] PTO ¶ 130; Proxy at 65.

[133] PTO ¶ 133; Proxy at 65-66; JX 479 at 2.

[134] Tr. 832-35 (Brannon); JX 479 at 1; JX 481 at 1.

[135] JX 481 at 1; JX 258 at 4.

[136] JX 481 at 5.

[137] Tr. 834 (Brannon).

Around 5:00 p.m. on January 23, Long authorized J.P. Morgan to use financial projections (the "January Projections") for its analyses and fairness opinion, flagging for J.P. Morgan that "forecasting was difficult due to the dramatically changing price environment."[138]

On January 23 at 9:30 p.m., the ETP conflicts committee counter-proposed an exchange ratio of 0.4066 plus $0.31 cash per common Regency unit.[139] As a part of this offer, ETE agreed to increase the IDR givebacks from $300 million to $320 ($80 million the first year and $60 million each year for the next four years).[140] Mike Grimm, a member of ETP's conflicts committee, testified this was ETP's "reserve price," that ETP had "maxed out ETE's willingness to further contribute" with IDR givebacks, and that ETP was not willing to go any higher.[141] Grimm instructed Welch to tell Brannon: "Take it or leave it."[142]

Later that night or early morning on January 24, the Regency Conflicts Committee met and discussed ETP's counterproposal, which it viewed as a rejection of its proposal for achieving a 15% premium based just on a 0.4088 ETP exchange

---

[138] JX 477 at 1.

[139] PTO ¶ 137; Proxy at 66.

[140] JX 504 at 2; JX 555 at 5.

[141] Tr. 1166, 1171-72 (Grimm); *see also* JX 920 at 254 (Grimm Dep.).

[142] Tr. 1169 (Grimm).

28

ratio.[143]  The Conflicts Committee, however, accepted ETP's "proposal in principle, subject to additional financial analysis to determine whether the proposed exchange ratio and the cash payment would provide, in the aggregate, a 15.0% premium to Regency's volume-weighted average price ("VWAP") for several trading days as compared to the closing price of ETP common units on January 23, 2015."[144]

On January 24, Barclays (ETP's financial advisor), J.P. Morgan, Long, and Welch had multiple discussions concerning the financial analysis related to achieving the 15% premium the Conflicts Committee was requesting.[145]  During this time, Welch told Brannon that ETP's last proposal (0.4066 exchange ratio plus $0.31 cash per unit) "gets you your 15 percent premium" and pushed Brannon to accept.[146] When Brannon refused to do so until the value of the offer could be confirmed, Welch got "mad" and told him to "just go it alone and see how you like that in six months."[147]  It later was determined that an exchange ratio of 0.4066 plus $0.32 cash per common Regency unit (instead of $0.31) would achieve the 15% premium.[148] ETP agreed to those terms.[149]

---

[143] PTO ¶ 138; Proxy at 66.

[144] PTO ¶ 138.

[145] Proxy at 66.

[146] Tr. 842-43 (Brannon).

[147] Tr. 842-44 (Brannon).

[148] Tr. 842-44 (Brannon).

[149] *See* JX 514 at 1.

Later on January 24, during a meeting of the Conflicts Committee to discuss the revised offer, J.P. Morgan provided an update on its valuation of the consideration the unaffiliated Regency unitholders would receive.[150] According to J.P. Morgan's slide deck, after factoring in the cash payment, the Merger was expected to be slightly accretive to the Regency common unitholders in 2015 (0.5%) but dilutive in 2016 (12.4%) on a distribution basis.[151] The Conflicts Committee discussed that Regency "would potentially need to cut its distribution in the next year" without the Merger, and that Regency's "long term growth prospects would be significantly better in a combined entity."[152] At the end of the meeting, the Conflicts Committee set a meeting for the next day to take final action regarding the potential transaction after receiving a fairness opinion from J.P. Morgan.[153]

On January 25 at 2:00 pm, J.P. Morgan reviewed the final deal terms—a 0.4066 exchange ratio plus $0.32 cash per common Regency unit—and verbally delivered its opinion that the aggregate consideration "was, from a financial point of view, fair to the unaffiliated holders of common units" of Regency.[154] After J.P.

---

[150] JX 513; JX 514 at 1-2; PTO ¶ 141.

[151] JX 513 at 21. These figures are consistent with the presentation that J.P. Morgan used when it delivered its final analysis and oral fairness opinion to the Conflicts Committee the next day, on January 25. *See* JX 540 at 21.

[152] JX 514 at 2.

[153] *Id.*

[154] JX 543 at 1-2; PTO ¶ 144.

Morgan's presentation, the Conflicts Committee determined to recommend approval of the Merger to the Board.[155]

On January 25 at 3:00 pm, the Board met to discuss the Merger. Brannon, on behalf of the Conflicts Committee, presented a report on the proposed transaction.[156] Representatives from J.P. Morgan then reviewed their fairness opinion analysis.[157] McReynolds noted for the Board that, post-Merger, Bradley would become an officer of ETE and Long would lead ETP's financial group.[158] Thereafter, the Board unanimously determined that the Merger "was in the best interest of the Partnership and the MLP Public Unitholders" and approved the Merger "based on the Conflicts Committee's recommendation," with Bradley, Brannon, Bryant and Gray voting in favor and McReynolds and Ramsey abstaining.[159]

Regency and ETP jointly announced the Merger on January 26, 2015.[160] After the announcement, Regency's unit price increased 5% even though it also announced

---

[155] JX 543 at 2-4; PTO ¶ 145.

[156] JX 537 at 1-3.

[157] *Id.* at 1.

[158] *Id.* at 2.

[159] *Id.* at 2-3.

[160] *See* JX 560.

a flat distribution.[161]  By contrast, ETP's unit price declined 6.4% even though it announced a $0.02 distribution increase.[162]

## J.    The Amendment to the Merger Agreement

On February 17, 2015, ETP proposed amending the merger agreement to replace the cash component of the Merger consideration ($0.32 per share) with additional ETP units so that Regency common unitholders would receive ETP units valued at $133.5 million (approximately $0.32 per Regency unit), based on the five-day VWAP as of the third day before the closing.[163]

On February 18, after reviewing ETP's proposal, the Conflicts Committee counter-proposed replacing the cash component with $0.33 worth of ETP units, based on the lower of ETP's (i) unit price on the closing date or (ii) three-day VWAP ending on the closing date.[164]  ETP rejected the Conflicts Committee's proposal to increase the consideration, and proposed that the $0.32 of ETP units instead be calculated based on the lesser of (i) the closing price of ETP units three days prior to closing or (ii) the five-day VWAP ending on the day three days prior to closing.[165]

---

[161] PTO Ex. A; JX 570 at 1; JX 576 at 3.

[162] JX 570 at 1; JX 578; PTO Ex. B (Dkt. 265).

[163] PTO ¶ 151; JX 634 at 2; JX 635 at 1; Proxy at 68.

[164] PTO ¶ 152; JX 635 at 2; *see* Proxy at 69.

[165] PTO ¶ 153; Proxy at 69.

Later in the day on February 18, the Regency Conflicts Committee met again to discuss the proposed amendment. J.P. Morgan informed the Conflicts Committee that it was not necessary to update its fairness analysis because it did not view the proposed change to the Merger consideration to be material.[166] After receiving advice from J.P. Morgan and Akin Gump, the Conflicts Committee determined that the Amendment would benefit Regency's unitholders by eliminating the ETP unitholder vote requirement, thereby providing greater deal certainty, and by deferring taxes on the make-whole payment.[167] The Conflicts Committee then recommended that the Regency Board approve amending the merger agreement to accept ETP's most recent proposal.[168]

During the evening of February 18, the Regency and ETP boards formally amended the merger agreement to replace the $0.32 cash payment with ETP units based on the quotient of $0.32 divided by the lesser of (i) the closing price of ETP units three days prior to closing or (ii) the five-day VWAP ending on the day three days before the closing (the "Amendment").[169] The exchange ratio of 0.4066 remained unchanged.[170]

---

[166] PTO ¶ 160; Tr. 695-96 (Castaldo); JX 635 at 2; *see* JX 641 at 5-6.

[167] JX 635 at 5-6; Tr. 857, 859-60 (Brannon).

[168] PTO ¶ 154.

[169] *Id.* ¶¶ 155, 157, 158; Proxy at 69-70.

[170] Proxy at 99.

Adoption of the Amendment eliminated ETP and Regency's obligation under Rule 13e-3 of the Securities Exchange Act to disclose J.P. Morgan's fairness opinion presentation because the Merger became a pure unit-for-unit exchange.[171]   As a result of the Amendment, the Merger became dilutive to the Regency common unitholders on a distribution basis for both 2015 and 2016 rather than just 2016.[172]

## K.    The Closing and Other Post-Amendment Events

In the first quarter of 2015, Regency's results missed management projections significantly:  Total adjusted EBITDA missed by 11.2% and distributable cash flow missed by 14.3%, while G&P's adjusted EBITDA missed by 22%.[173]   Regency's coverage ratio declined to 0.77x, its leverage ratio climbed to 5.26x, and its liquidity fell to $299 million.[174]   Its distributable cash flow fell 17% below the January Projections.[175]   By contrast, ETP exceeded its internal distributable cash flow projections by 7.6%.[176]

On March 24, 2015, Regency issued a definitive proxy statement (the "Proxy") in advance of a special meeting of Regency unitholders to be held on April

---

[171] *See* JX 633 at 2.

[172] Proxy at 72.

[173] *See* JX 696 at 5.

[174] JX 883.

[175] *Compare* JX 450, *with* JX 883.

[176] JX 842 ¶ 100, Ex. 5B.

28, 2015 to consider and vote on whether to approve the Merger.[177]  As of the record date for the special meeting, Regency had 419,130,009 units outstanding that were entitled to vote, of which 94,804,258 units or 22.62% were affiliated (*i.e.*, held by Regency's directors, officers, or their affiliates, including ETE and ETP) and 324,325,751 or 77.38% were unaffiliated.[178]

At Regency's stockholders meeting, 288,192,799 units voted in favor of the transaction, representing 99.57% of units present at the meeting and 68.76% of total units outstanding.[179]  Of the unaffiliated units, at least 193,388,541 units voted in favor of the Merger, representing at least 99.37% of the unaffiliated units present at the meeting and at least 59.63% of the total unaffiliated units outstanding.[180]

The Merger closed on April 30, 2015.[181]  At the closing, each Regency common unit was converted into 0.4124 units of ETP,[182] or $21.83, which was equivalent to a 0.3% premium based on Regency's unaffected unit price as of the date the Merger was announced ($23.75) compared to ETP's unit price as of the date the Merger closed ($23.83).[183]

---

[177] *See* Proxy.

[178] *See id.* at 56; JX 700.

[179] JX 700.

[180] *Id.* These figures assume all affiliated units voted in favor of the Merger.

[181] PTO ¶ 162.

[182] *Id.* ¶ 163.

[183] *Id.* ¶¶ 163, 165.

Also on April 30, Regency finished its "3+9 forecast" for 2015, which incorporated its actual first quarter results and re-forecasted the last three quarters of 2015, with no changes beyond 2015 (the "April Projections").[184] The April Projections projected 2015 distributable cash flow 33% below the January Projections.[185] They also projected that Regency's leverage ratio would rise to 5.98x (which would violate the 5.50x leverage ratio in its bank debt covenants[186]), that Regency would have no liquidity for the last three quarters of 2015, and that it would have to issue higher-cost equity for all capital needs.[187]

The same day the Merger closed, Brannon was re-appointed to the Sunoco Board and Bryant joined the Sunoco board.[188] In April 2015, Bradley became a Vice President at ETE and Long became the CFO of ETP.[189]

The downturn in the oil and gas industry continued after the closing. In early 2016, almost two-thirds of U.S. oil and gas rigs that were operational in late 2015 had stopped drilling and oil and gas prices reached 12- and 17-year lows,

---

[184] JX 883; Tr. 1133-38 (Bramhall).

[185] *Compare* JX 883, *with* JX 540 at 11.

[186] *See* JX 590 at 38.

[187] JX 883.

[188] JX 705 at 1; JX 719 at 3.

[189] Tr. 580 (Bradley); JX 822 at 44; JX 598 at 2; JX 818 at 219.

respectively.[190]  As of trial, gas prices were lower than they were when the Merger closed more than four years earlier.[191]

In 2015 and 2016, ETP's midstream business, which included Regency's G&P assets, shrank by a combined 15%, even though the January Projections predicted 28% growth.[192]  By contrast, ETP's *pro forma* EBITDA in 2015 exceeded its projections despite legacy Regency's poor results.[193]

## II.  PROCEDURAL HISTORY

On June 10, 2015, Plaintiff filed his original complaint, asserting four claims on behalf of a class of Regency common unitholders as of the date of the Merger. Defendants moved to dismiss the complaint.  They contended, among other things, that their approval of the Merger was shielded from review because two safe harbors in Section 7.9(a) of the LP Agreement (discussed below) had been satisfied: (i) the "Special Approval" safe harbor, which would be triggered upon approval of the Merger by the Conflicts Committee; and (ii) the "Unitholder Approval" safe harbor, which would be triggered upon approval of the Merger by a majority of the

---

[190] *See* JX 918; JX 854; JX 855.

[191] Tr. 762 (Brannon); JX 855 at 1.

[192] Tr. 1138-43 (Bramhall).

[193] Tr. 332-33 (Canessa).

Regency's unaffiliated common units.[194]  On March 29, 2016, the court dismissed all four claims based on application of the Unitholder Approval safe harbor.[195]

On January 20, 2017, the Delaware Supreme Court reversed.[196]  It explained "that implied in the language of the LP Agreement's conflict resolution provision is a requirement that the General Partner not act to undermine the protections afforded unitholders in the safe harbor process."[197]  The high court found that Plaintiff had plead sufficient facts to support a reasonably conceivable claim that the Unitholder Approval safe harbor was not satisfied because the General Partner "allegedly made false and misleading statements to secure" that approval, and that the Special Approval safe harbor was not satisfied because the General Partner "allegedly used a conflicted Conflicts Committee."[198]

On May 5, 2017, Plaintiff filed an Amended Complaint, reasserting four claims.  Count I asserted that the General Partner breached the express terms of the LP Agreement "because the Merger was not, and [the General Partner] did not believe that the Merger was, in the best interests of the Regency Partnership

---

[194] *See Dieckman*, 2016 WL 1223348, at *3, *6.

[195] *Id.* at *6.

[196] *Dieckman*, 155 A.3d at 360.

[197] *Id.* at 368.

[198] *Id.* at 361.

(including its limited partners)."[199] Count II asserted that the General Partner breached the implied covenant of good faith and fair dealing inherent in the LP Agreement.[200] Count III asserted that ETP, EGP, ETE, and the members of the General Partner's board aided and abetted a breach of the LP Agreement.[201] Count IV asserted that those same defendants tortiously interfered with the LP Agreement.[202]

On February 20, 2018, the court issued an order granting in part and denying in part defendants' motion to dismiss the Amended Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. Specifically, the court denied the motion to dismiss Count I; granted in part and denied in part the motion to dismiss Count II; and granted the motion to dismiss Counts III and IV.[203] As to Count I, the court found that the "Amended Complaint alleges facts from which it is reasonably conceivable that the General Partner . . . did not believe that the Merger was in the best interests of the Partnership and thus violated [LP Agreement] § 7.9(b)."[204] As to Count II, as the court later clarified, the claim was dismissed only

---

[199] Am. Compl. ¶ 149 (Dkt. 65).

[200] *Id.* ¶¶ 158-71.

[201] *Id.* ¶¶ 172-79.

[202] *Id.* ¶¶ 180-87.

[203] *Dieckman*, 2018 WL 1006558 (Del. Ch. Feb. 28, 2018) (ORDER).

[204] *Id*. at *2-3.

insofar as it related to Section 7.9(b) of the LP Agreement and survived with respect to Sections 7.9(a) and 7.10(b) of the LP Agreement.[205]

On April 26, 2019, the court entered an order certifying a class under Court of Chancery Rules 23(a) and 23(b)(1) and (2) of all Regency common unitholders other than the General Partner, ETP, ETE, and their respective affiliates (the "Class").[206]

On May 14, 2019, the parties filed cross-motions for partial summary judgment.[207] Defendants sought summary judgment in their favor on Count I of the Amended Complaint based on Section 7.10(b) of the LP Agreement, which provides in part that an act the General Partner takes in reasonable reliance upon the opinion of an investment banker shall be conclusively presumed to have been done in good faith.[208] Plaintiff sought summary judgment that (i) the General Partner did not obtain a Special Approval for the Merger because the Conflicts Committee was not validly constituted and (ii) Defendants could not have obtained the Unitholder Approval because "the proxy misrepresented material facts to Regency's LP unitholders asked to vote on the Merger."[209]

---

[205] Dkt. 255 ¶ 1.

[206] *Dieckman*, 2019 WL 4541460, at *1.

[207] Dkts. 209-12.

[208] *Dieckman*, 2019 WL 5576886, at *5.

[209] *Id.* at *8, *12.

40

On October 29, 2019, the court denied Defendants' motion for partial summary judgment and granted Plaintiff's motion for partial summary judgment (the "SJ Opinion").[210] As to the latter motion, the court found, for the reasons discussed in Part IV, that Plaintiff was entitled to summary judgment that neither the Special Approval safe harbor nor the Unitholder Approval safe harbor had been satisfied in connection with the Merger.[211]

The court held a five-day trial in December 2019 and heard post-trial argument on May 6, 2020. In response to the court's request, the parties provided supplemental submissions on September 15, 2020.

## III. FRAMEWORK OF THE ANALYSIS

The parties' dispute concerns two types of contractual claims. The first is for breach of an express provision of the LP Agreement. The second is for breach of the implied covenant of good faith and fair dealing inherent in the LP Agreement.

It is the policy of the Delaware Revised Uniform Limited Partnership Act to give "maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements."[212] This freedom includes the ability to expand, restrict, or eliminate fiduciary duties.[213] Here, Section 7.9(e) of the LP

---

[210] *Id.* at *13.

[211] *Id.* at *1.

[212] 6 *Del. C.* § 17-1101(c).

[213] *Id.* § 17-1101(d).

Agreement provides that the General Partner shall owe no duties, including fiduciary duties, to the Partnership or any limited partner other than those expressly set forth in the LP Agreement:

> Except as expressly set forth in this Agreement, neither the General Partner nor any other Indemnitee shall have any duties or liabilities, including fiduciary duties, to the Partnership or any Limited Partner and the provisions of this Agreement, to the extent that they restrict, eliminate or otherwise modify the duties and liabilities, including fiduciary duties, of the General Partner or any other Indemnitee otherwise existing at law or in equity, are agreed by the Partners to replace such other duties and liabilities of the General Partner or such other Indemnitee.[214]

Thus, the duties the General Partner owed to the Partnership and any of the limited partners are entirely contractual in nature.[215]

The parties' briefs focus on three provisions of the LP Agreement relevant to defining the duties of the General Partner when it approved the Merger: Sections 7.9(a), 7.9(b), and 7.10(b).

---

[214] LPA § 7.9(e).

[215] *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 252-53 (Del. 2017) ("If fiduciary duties have been validly disclaimed, the limited partners cannot rely on traditional fiduciary principles to regulate the general partner's conduct. Instead, they must look exclusively to the LPA's complex provisions to understand their rights and remedies.") (citing *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 175 (Del. 2002)).

Section 7.9(a), which applies "whenever a potential conflict of interest exists or arises between" the General Partner and the Partnership unless "otherwise expressly provided" in the LP Agreement,[216] states, in relevant part, that:

> Unless otherwise expressly provided in this Agreement . . . , whenever a potential conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership, any Group Member or any Partner, on the other, any resolution or course of action by the General Partner or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement . . . or of any duty stated or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval, (ii) approved by the vote of a majority of the Common Units (excluding Common Units owned by the General Partner and its Affiliates), (iii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or (iv) fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership). The General Partner shall be authorized but not required in connection with its resolution of such conflict of interest to seek Special Approval of such resolution, and the General Partner may also adopt a resolution or course of action that has not received Special Approval. If Special Approval is not sought and the Board of Directors of the General Partner determines that the resolution or course of action taken with respect to a conflict of interest satisfies either of the standards set forth in clauses (iii) or (iv) above, then it shall be presumed that, in making its decision, the Board of Directors of the General Partner acted in good faith, and in any proceeding brought by any Limited Partner . . . challenging such approval, the Person bringing

---

[216] *See, e.g.,* LPA § 7.5(c) (eliminating application of the corporate opportunity doctrine to the General Partner), § 7.6 (governing loans by the General Partner to the Partnership or its subsidiaries).

43

or prosecuting such proceeding shall have the burden of overcoming such presumption [217]

The LP Agreement defines a "Special Approval"—which appears in the first clause of the first sentence of Section 7.9(a)—to mean "approval by a majority of the members of the Conflicts Committee."[218] This opinion refers at times to clauses (ii), (iii), and (iv) of that same sentence, respectively, as the "Unitholder Approval," "Unrelated Third Parties," and "Fair and Reasonable" clauses.

The first two clauses in Section 7.9(a) operate differently than the latter two. When an action of the General Partner is subject to a valid Special Approval or Unitholder Approval, the action "shall not constitute a breach of this Agreement . . . or of any duty stated or implied by law or equity."[219] By contrast, when a Special Approval is not sought and the General Partner determines that an action "taken with respect to a conflict of interest satisfies either of the standards set forth in clauses (iii) or (iv)," it is presumed that the General Partner acted in good faith and a plaintiff would have the burden to overcome such a presumption.[220]

Section 7.9(b), which applies to actions the General Partner takes "in its capacity as general partner of the Partnership" unless the LP Agreement provides

---

[217] *Id.* § 7.9(a).

[218] *Id.* § 1.1.

[219] *Id.* § 7.9(a).

[220] *Id.*

44

"another express standard," states that such actions shall be governed by the standard

of good faith:

> Whenever the General Partner makes a determination or takes or declines to take any other action . . . in its capacity as the general partner of the Partnership as opposed to in its individual capacity, then, unless another express standard is provided for in this Agreement, the General Partner, or such Affiliates causing it to do so, shall make such determination or take or decline to take such other action in good faith and shall not be subject to any other or different standards imposed by this Agreement . . . or under the Delaware Act or any other law, rule or regulation or at equity. In order for a determination or other action to be in "*good faith*" for purposes of this Agreement, the Person or Persons making such determination or taking or declining to take such other action must believe that the determination or other action is in the best interests of the Partnership.[221]

As our case law makes clear, the use of the unmodified verb "believe" in the

definition of "good faith" in Section 7.9(b) means that the good faith standard in the

LP Agreement is subjective and not objective.[222]

Section 7.10(b), which appears in a section of the LP Agreement entitled

"Other Matters Concerning the General Partner," provides a conclusive presumption

---

[221] *Id.* § 7.9(b).

[222] *See, e.g., Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 101, 104 (Del. 2013) (explaining that a definition of good faith that uses the term "believes" as opposed to "reasonably believes" "eschews an objective standard" and is satisfied "if the actor *subjectively believes* that it is in the best interests of [the partnership]."); *In re CVR Refining, LP Unitholder Litig.*, 2020 WL 506680, at *9 (Del. Ch. Jan. 31, 2020); *Morris v. Spectra*, 2017 WL 2774559, at *14 (Del. Ch. June 27, 2017); *Allen v. El Paso Pipeline GP Co. L.L.C.*, 113 A.3d 167, 178-79 (Del. Ch. 2014) *aff'd*, 2015 WL 803053, at *1 (Del. Feb. 26, 2015) (TABLE).

that the General Partner acted in "good faith" if the General Partner relied upon the

opinion of certain advisers, including an investment banker, as follows:

> The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisers selected by it, and any act taken in reliance upon the opinion (including an opinion of Counsel) of such Persons as to matters that the General Partner reasonably believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith and in accordance with such opinion.[223]

A fourth provision of the LP Agreement relevant to the parties' disputes is

Section 7.8(a), which provides that the General Partner (as an "Indemnitee")[224] shall

not be liable for monetary damages in a civil matter unless the General Partner "acted

in bad faith or engaged in fraud [or] willful misconduct:"

> Notwithstanding anything to the contrary set forth in this Agreement, no Indemnitee shall be liable for monetary damages to the Partnership, the Limited Partners or any other Persons who have acquired interests in the Partnership Securities, for losses sustained or liabilities incurred as a result of any act or omission of an Indemnitee unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of the matter in question, the Indemnitee acted in bad faith or engaged in fraud, willful misconduct or, in the case of a criminal matter, acted with knowledge that the Indemnitee's conduct was criminal.[225]

---

[223] LPA § 7.10(b).

[224] *Id.* § 1.1 (defining "Indemnitee" to mean, among other persons, "the General Partner").

[225] *Id* § 7.8(a).

The court's analysis proceeds in five parts. Part IV addresses Plaintiff's claim that the General Partner breached the implied covenant of good faith and fair dealing inherent in the Special Approval and Unitholder Approval provisions in Section 7.9(a). Part V analyzes what contractual standard in the LP Agreement applies to the General Partner's approval of the Merger and concludes that the operative standard is whether the Merger satisfies the Fair and Reasonable standard in clause (iv) of Section 7.9(a). Part VI analyzes whether Defendants proved that the Merger satisfied the Fair and Reasonable standard. Part VII analyzes whether the General Partner is liable for monetary damages under Section 7.8(a). Part VIII analyzes the evidence submitted on the issue of damages.

The evidentiary standard for an express breach of contract and a breach of the implied covenant of good faith and fair dealing is preponderance of the evidence.[226]

## IV. THE IMPLIED COVENANT CLAIM

In Count II of his Amended Complaint, Plaintiff asserted that the General Partner breached the implied covenant of good faith and fair dealing inherent in the LP Agreement.[227] Count II survived dismissal to the extent Plaintiff wished to

---

[226] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834 n.112 (Del. Ch. 2007) (citation and internal quotation marks omitted) ("The burden of persuasion with respect to the existence of [a] contractual right is a preponderance of the evidence standard."); *SinoMab BioScience Ltd. v. Immunomedics, Inc.*, 2009 WL 1707891, at *12 (Del. Ch. June 16, 2009) (applying preponderance of the evidence standard to an implied covenant claim).

[227] Am. Compl. ¶ 159.

advance implied covenant arguments with respect to Sections 7.9(a) and 7.10(b) of the LP Agreement.[228] After trial, Plaintiff asserted an implied covenant claim only with respect to Section 7.9(a). Specifically, Plaintiff contends the General Partner breached the implied covenant of good faith and fair dealing implied in the Special Approval and Unitholder Approval safe harbors.[229] The General Partner's response is relegated to a footnote that does not contest the merits of Plaintiff's position challenging Defendants' reliance on either of these safe harbors.[230]

The purpose of the implied covenant of good faith and fair dealing is to "infer contract terms 'to handle developments or contractual gaps that the asserting party pleads neither party anticipated.' It applies 'when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably asserted.'"[231]

As noted above, the LP Agreement defines "Special Approval" to mean "approval by a majority of the members of the Conflicts Committee."[232] The

---

[228] Dkt. 255 ¶ 1.

[229] Pl.'s Opening Post-Trial Br. 44-48 (Dkt. 303).

[230] *See* Defs.' Post-Trial Br. 66 n.297 (Dkt. 305) ("But failure to satisfy the implied covenant under one (or two) of four *disjunctive* safe harbors 'does not end the analysis,' because the Court must then determine whether Defendants 'independently satisfied' another safe harbor or standard.") (quoting *Gerber v. Enter. Prod. Hldgs., LLC*, 67 A.3d 400, 423 (Del. 2013)).

[231] *Dieckman*, 155 A.3d at 367 (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125-26 (Del. 2010)).

[232] LPA § 1.1.

definition of the term "Conflicts Committee," which is quoted in full below, includes several requirements to qualify for membership. The qualification most relevant to this action is that none of the members of the Conflicts Committee can serve simultaneously as a director of the General Partner and on the board of an "Affiliate" of the General Partner:

> *"Conflicts Committee means" a committee of the Board of Directors of the general partner of the General Partner composed entirely of two or more directors who are not* (a) security holders, officers or employees of the General Partner, (b) *officers, directors or employees of any Affiliate of the General Partner* or (c) holders of any ownership interest in the Partnership Group other than Common Units and who also meet the independence standards required of directors who serve on an audit committee of a board of directors established by the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission thereunder and by the National Securities Exchange on which the Common Units are listed or admitted to trading. [233]

This opinion refers to this provision hereafter as the "Qualification Provision."

As our Supreme Court explained earlier in this case, the Special Approval safe harbor is:

> . . . reasonably read by unitholders to imply a condition that a Committee has been established whose members genuinely qualified as unaffiliated with the General Partner and independent at all relevant times. Implicit in the express terms is that the Special Committee

---

[233] *Id*. § 1.1 (emphasis added). "Affiliate" is defined in the LP Agreement to mean "with respect to any Person, any other Person that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with, the Person in question." *Id*. The term "Person" is defined broadly to mean "an individual or a corporation, firm, limited liability company, partnership, joint venture, trust, unincorporated organization, association, government agency, or political subdivision thereof or other entity." *Id.*

membership be genuinely comprised of qualified members and that deceptive conduct not be used to create the false appearance of an unaffiliated, independent Special Committee.[234]

In the SJ Opinion, the court granted partial summary judgment in Plaintiff's favor "that the Special Approval safe harbor in the LP Agreement was not satisfied in connection with the Merger."[235] This conclusion followed from undisputed evidence that Brannon was still a director of an affiliate of the General Partner (Sunoco) when he joined the Conflicts Committee.[236]

To satisfy the Unitholder Approval safe harbor in the LP Agreement, a transaction must be "approved by the vote of a majority of the Common Units (excluding Common Units owned by the General Partner and its Affiliates)."[237] As to this safe harbor, our Supreme Court explained that "once [the General Partner] went beyond the minimal disclosure requirements of the LP Agreement and issued a 165–page proxy statement to induce the unaffiliated unitholders not only to approve the merger transaction, but also to secure the Unaffiliated Unitholder Approval safe harbor, implied in the language of the LP Agreement's conflict resolution provision was an obligation not to mislead unitholders."[238]

---

[234] 155 A.3d at 369.

[235] 2019 WL 5576886, at *11.

[236] *Id.* at *9-11; JX 600.

[237] LPA § 7.9(a)(ii).

[238] 155 A.3d at 360.

In the SJ Opinion, the court granted partial summary judgment in Plaintiff's favor "that the Unitholder Approval safe harbor in the LP Agreement was not satisfied in connection with the Merger."[239] This conclusion was based on two materially misleading disclosures in the Proxy, *i.e.*, that (i) the "Regency Conflicts Committee consists of two independent directors: Richard D. Brannon (Chairman) and James W. Bryant" and (ii) "the Conflicts Committee's approval of the Merger 'constituted Special Approval as defined in the Regency partnership agreement.'"[240] As explained in the SJ Opinion, the court's findings concerning the failure to satisfy the Special Approval safe harbor dictated the conclusion that the Proxy was false in both respects:

> The representation in the Proxy that Brannon was independent was false for the reasons discussed in the previous section. To repeat, Brannon was not independent because he did not satisfy the criteria for serving on the Conflicts Committee due to his simultaneous service on the board of an Affiliate of the General Partner (Sunoco).
>
> * * * * *
>
> The falsity of [the second] representation flows from Brannon's lack of independence. The representation was false because there was no Special Approval since the Conflicts Committee was not validly constituted.[241]

---

[239] *Dieckman*, 2019 WL 5576886, at *13.

[240] *Id.* at *12 (quoting Proxy at 70-71) (internal quotation omitted).

[241] *Id.* To be clear, in finding that the Proxy falsely represented that Brannon was "independent," the court applied "the criteria for serving on the Conflicts Committee" in the LP Agreement and did not hold that Brannon was not independent based on Delaware common law principles. *Id.*

Apart from challenging the disclosures concerning the Conflicts Committee just discussed, both of which were addressed in the SJ Opinion, Plaintiff contends Defendants intentionally (i) failed to disclose in the Proxy that "the Amendment had made the deal immediately dilutive to Regency's unitholders" and (ii) "withheld J.P. Morgan's accretion/dilution analysis."[242]  Both contentions are without merit.

As to the first point, the Proxy disclosed that the Merger would result in immediate dilution to Regency's unitholders.  Specifically, the first bullet point in the Proxy's discussion of "negative or unfavorable factors" stated that "Regency unitholders will receive ETP common units that, at least through 2016, are expected to pay a lower distribution as compared to the expected distribution on Regency common units during that period."[243]  Analysts and proxy advisory services similarly recognized that the transaction would be immediately dilutive to Regency unitholders.[244]

As to the second point, Plaintiff contends that if the Conflicts Committee had not approved the Amendment, Regency would have been legally required to disclose

---

[242] Pl.'s Opening Post-Trial Br. 48.

[243] Proxy at 72.

[244] JX 614 at 2 ("While RGP unitholders will see a decrease in their annual distribution, unitholders receive a 13% premium, access to a larger more diversified company, and an improved growth profile."); JX 691 at 9 ("It appears that the merger will effectively lower the distribution levels for current Regency holders, which will allow IDR payouts to accrue faster.").

J.P. Morgan's fairness presentation, which showed that the Merger would be significantly accretive to ETE and would decrease the cash distributions to Regency unitholders in 2016.[245] There is no evidence, however, linking the Conflicts Committee's decision to approve the Amendment to avoiding disclosure of J.P. Morgan's accretion/dilution analysis and, in any event, the substance of that analysis already had been disclosed.[246] To be more specific, within days of the Merger announcement and weeks before the Amendment, numerous analysts had calculated and reported on ETE and Regency's projected accretion/dilution from the Merger.[247] As Plaintiff's valuation expert testified, "as soon as there's a shift in the IDR splits, the market knows what's happening."[248]

In sum, for the reasons explained above and in the SJ Opinion, the court finds that the General Partner breached the implied covenant of good faith and fair dealing in the Special Approval and Unitholder Approval safe harbors of Section 7.9(a) of the LP Agreement. This conclusion does not mean that the General Partner breached an affirmative standard of conduct applicable to its approval of the Merger. It simply

---

[245] Pl.'s Opening Post-Trial Br. 34.

[246] *See In re MONY Grp., Inc. S'holder Litig.*, 853 A.2d 661, 683 (Del. Ch. 2004), *as revised* (Apr. 14, 2004) (no omission where particular investors' profit was a "fact that was readily available to the stockholders").

[247] *See* JX 569 at 1; JX 581 at 12; JX 570 at 1; JX 614 at 2; Tr. 211 (O'Loughlin); Tr. 160-62 (Canessa).

[248] Tr. 266 (Canessa).

means that the General Partner may not avail itself of Special and Unitholder Approval safe harbors in Section 7.9(a) that would have shielded the General Partner's approval of the Merger from judicial review if either of them had been satisfied.

## V. WHAT STANDARD GOVERNS THE EXPRESS BREACH CLAIM?

Turning to Plaintiff's claim that the General Partner breached an express provision of the LP Agreement in connection with the Merger, the parties disagree on a seemingly straightforward question: What contractual standard applies to the General Partner's approval of the Merger?

Relying on Section 7.9(b) of the LP Agreement, Defendants contend the applicable standard is subjective good faith, *i.e.*, did a majority of the Board members who approved the Merger believe the Merger was in the best interests of the Partnership? Defendants further contend they are entitled to a conclusive presumption of good faith under Section 7.10 of the LP Agreement because the General Partner relied on J.P. Morgan's opinion that the Merger consideration was fair when the General Partner approved the Merger.

Plaintiff contends that the subjective good faith standard in Section 7.9(b) of the LP Agreement does not apply to the Merger and that Defendants instead must satisfy one of the "standards" in clause (iii) or (iv) of Section 7.9(a) by showing that "the Merger 'was on terms no less favorable to [Regency] than those generally being

provided to or available from unrelated third parties' or 'fair and reasonable to [Regency] taking into account the totality of the relationships between the parties involved.'"[249]  Plaintiff further contends that the conclusive presumption of good faith in Section 7.10(b) does not apply to the Merger.  The court turns next to analyze these two questions by applying basic principles of contract interpretation.

The LP Agreement is a contract governed by Delaware law.[250]  When interpreting a contract, "the role of the court is to effectuate the parties' intent."[251]  Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[252]

## A.    Does Section 7.9(a) or 7.9(b) Apply to Approval of the Merger?

Plaintiff's argument that clauses (iii) and (iv) of Section 7.9(a) govern the General Partner's approval of the Merger is based on two premises.  The first is that Section 7.9(b) expressly provides that the subjective good faith standard applies

---

[249] Pl.'s Opening Post-Trial Br. 48 (quoting LPA § 7.9(a)).

[250] LPA § 16.9.

[251] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[252] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

"unless another express standard is provided for in this Agreement."[253] The second premise is that Section 7.9(a) of the LP Agreement—which expressly refers to "clauses (iii) or (iv)" as "standards"[254]—provides another express standard to govern when there is a potential conflict of interest between the General Partner and the Partnership. For support, Plaintiff relies on Vice Chancellor Laster's decisions in *Allen v. El Paso Pipeline GP Co., L.L.C.*[255] and *Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*.[256]

The operating agreements in *El Paso* and *Bandera* contain provisions that are substantively identical to Sections 7.9(a) and 7.9(b) of the LP Agreement. Among other things, they each: (i) include the same four clauses in Section 7.9(a); (ii) expressly provide in Section 7.9(b) that the subjective good faith standard governs "unless another express standard is provided for" in the agreement; (iii) refer in Section 7.9(a) to the Unrelated Third Parties and Fair and Reasonable clauses as "standards"; and (iv) provide that if a Special Approval is not sought and the general

---

[253] LPA § 7.9(b) (providing that "[w]henever the General Partner makes a determination or takes or declines to take any other action . . . in its capacity as the general partner of the Partnership as opposed to in its individual capacity, then, unless another express standard is provided for in this Agreement, . . .").

[254] *Id.* § 7.9(a) (providing that "[i]f Special Approval is not sought and the Board of Directors of the General Partner determines that the resolution or course of action taken with respect to a conflict of interest satisfies either of the standards set forth in clauses (iii) or (iv) above . . .").

[255] 90 A.3d 1097 (Del. Ch. 2014).

[256] 2019 WL 4927053 (Del. Ch. Oct. 7, 2019).

partner determines that an action satisfies either the Unrelated Third Parties or Fair and Reasonable standards, it shall be presumed that the general partner "acted in good faith" and a plaintiff would "have the burden of overcoming such presumption."[257] Construing these provisions, the court held in both cases that Section 7.9(a) applies in lieu of the good faith standard of Section 7.9(b) when a decision of the general partner involves a potential conflict of interest.[258]

In *El Paso*, which involved a conflicted transaction whereby the partnership acquired a 25% interest in Southern Natural Gas Co. from the parent of its general partner, the court explained the interplay of Sections 7.9(a) and 7.9(b) as follows:

> At first blush, [the good faith standard in Section 7.9(b)] appears to apply to all decisions made by the General Partner in its capacity as the General Partner. Analytically, however, Section 7.9(b) applies only to decisions made by the General Partner in its capacity as the General Partner that do not involve a conflict of interest, because Section 7.9(b) states that the standard it sets forth will apply "unless another express standard is provided for in this Agreement." When a decision involves a potential conflict of interest on the part of the General Partner, Section 7.9(a) provides "another express standard." Under that section, when the General Partner takes action in its capacity as the General Partner, and the action involves a conflict of interest, then the action will be 'permitted and deemed approved by all Partners' and 'not constitute a breach' of the LP Agreement or 'any duty stated or implied by law or equity' as long as the General Partner proceeds in one of four contractually specified ways. In general terms, the four alternatives are

---

[257] JX 30 (El Paso Limited Partnership Agreement) §§ 7.9(a), (b); Verified Class Action Compl. (Dkt. 86), Ex. 1 ("Third Amended and Restated Agreement of Limited Partnership of Boardwalk Pipeline Partners, LP") §§ 7.9(a), (b), *Bandera* (No. 2018-0372-JTL), 2019 WL 4927053.

[258] *El Paso*, 90 A.3d at 1110; *Bandera*, 2019 WL 4927053, at *11.

57

> (i) good faith approval by a committee composed of disinterested members of the GP Board, (ii) approval by disinterested unitholders, (iii) a judicial finding that the transaction was on arm's-length terms comparable to what a third party would provide, or (iv) a judicial finding that the transaction was fair and reasonable to the partnership.

* * * * *

> For decisions taken by the General Partner in its capacity as such, the LP Agreement thus escalates from an expansive and highly deferential standard for non-conflict transactions (Section 7.9(b)), to a narrower standard for conflict transactions in general (Section 7.9(a)).[259]

After the court entered summary judgment in defendants' favor in a subsequent decision based on the Special Approval clause in Section 7.9(a), the Supreme Court summarily affirmed.[260]

In *Bandera*, the general partner of Boardwalk Pipeline Partners, LP exercised an option to purchase all of the partnership's publicly traded common units about three months after publicly announcing it was "seriously considering" doing so, which "caused the trading price of the common units to plummet."[261] The parties agreed that the general partner "was acting in its official capacity as the general partner" when the partnership disclosed it "was evaluating whether to remain a publicly traded entity, citing the potential exercise of the Call Right by the General

---

[259] *El Paso*, 90 A.3d at 1102-03.

[260] *El Paso*, 113 A.3d at 178, 181-82.

[261] 2019 WL 4927053, at *1.

Partner."[262] Finding it reasonably conceivable the general partner "faced a potential conflict" in deciding "whether and when" to make this disclosure, the court looked to Section 7.9(a) rather than Section 7.9(b) for the operative standard.[263] The court explained that under Section 7.9(a), "the General Partner must be able to show that it complied with one of four enumerated paths for its action 'not [to] constitute a breach of the Agreement . . . or of any duty stated or implied by law or equity.'"[264] After ruling out the availability of any of the first three paths in Section 7.9(a), the court denied defendants' motion to dismiss, holding it was reasonably conceivable that it was not "fair and reasonable" to the partnership for the general partner to cause the partnership to make the challenged disclosure.[265]

Defendants do not challenge the substance of the court's textual analysis of the interplay between Sections 7.9(a) and 7.9(b) in *El Paso* or *Bandera*. Instead, they cite several other decisions for the proposition that Section 7.9(a) "provides optional safe harbors, not a governing standard."[266] Significantly, however, Defendants do not explain the reasoning of any of these decisions—only two of which involved partnership agreements with provisions similar to Sections 7.9(a)

---

[262] *Id.* at *4, *11, *14.

[263] *Id.* at *13-14.

[264] *Id.* at *11.

[265] *Id.* at *14.

[266] Defs.' Post-Trial Br. 41.

and Section 7.9(b) of the Regency LP Agreement[267] and none of which analyzed the interplay between those two provisions for purposes of resolving an actual controversy over which provision applied.[268]

In *Encore*, for example, which was decided before *El Paso* and *Bandera*, our Supreme Court referred to the four clauses in Section 7.9(a) as "safe harbors" without analyzing the interplay between Sections 7.9(a) and 7.9(b) or considering whether the Unrelated Third Parties and Fair and Reasonable clauses in Section 7.9(a) could operate as standards of judicial review.[269] Nor did the court have any reason to conduct such an analysis because the issue on appeal concerned the Special Approval provision in clause (i) of Section 7.9(a), *i.e.*, whether plaintiff had plead

---

[267] *See Encore*, 72 A.3d at 101-03, 109; *Spectra*, 2017 WL 2774559, at *6-7.

[268] *See Enbridge*, 159 A.3d at 247, 254 (holding that the trial court erred "when it held that other 'good faith' provisions" modified Section 6.6(e) of the partnership agreement, which required that a sale or transfer of property to, or purchase of property from, the partnership must be "fair and reasonable"); *Encore*, 72 A.3d at 95, 109 (affirming dismissal of challenge to merger based on Special Approval in Section 7.9(a) of partnership agreement where plaintiff failed to plead facts sufficient to overcome presumption that Conflicts Committee members acted in subjective good faith); *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 362-66 (Del. 2013) (finding that safe harbors in Section 7.9(a) did not displace general discretion standard in Section 14.2 of partnership agreement for approval of mergers); *In re Kinder Morgan, Inc. Corp. Reorganization Litig.*, 2015 WL 4975270, at *6-7 (Del. Ch. Aug. 20, 2015), *aff'd sub nom. Haynes Fam. Tr. v. Kinder Morgan G.P. Inc.*, 135 A.3d 76 (TABLE) (Del. 2016) (holding that plaintiffs failed to identify "a violation of the contractual requirements for Special Approval"); *Spectra*, 2017 WL 2774559, at *10 (holding that rebuttable presumption of good faith under Section 7.9(a) for a Special Approval applied to transaction between partnership and its parent and that conclusive presumption of good faith under Section 7.10(b) where general partner acts in reasonable reliance on certain professional opinions did not apply).

[269] *See Encore*, 72 A.3d at 102.

sufficient facts to rebut the presumption that a conflicts committee acted in subjective good faith.[270] The *Encore* decision gives no indication that any argument was made that the subjective good faith standard in Section 7.9(b) should apply.

As the *Encore* court observed, "[a]lthough the limited partnership agreements in these cases contain similar provisions, those facial similarities can conceal significant differences between the limited partnership agreements."[271] It is logical to refer to the Special Approval and Unitholder Approval clauses in Section 7.9(a) as "safe harbors" since each entails using a conflict-cleansing mechanism as a condition of approval of a conflicted transaction (*i.e.*, use of an independent committee and/or approval of a majority of the disinterested unitholders) that, if employed properly, would preclude judicial review of the General Partner's approval of such transaction.

By contrast, the Unrelated Third Parties and Fair and Reasonable clauses more naturally operate as standards of judicial review of the decision of the General Partner to approve a conflicted transaction where the conflict-cleansing mechanisms in clauses (i) and (ii) are not utilized as a precondition of approval—or where, like here, one tries but fails to utilize them properly. It is thus unsurprising that Section 7.9(a) expressly refers to both of clauses (iii) and (iv) as "standards." Indeed, to

---

[270] *Id.* at 102-03.

[271] *Id.* at 100.

agree with Defendants that the subjective good faith standard in Section 7.9(b) should apply here to a conflicted transaction involving the General Partner would render meaningless the language in Section 7.9(a) expressly referring to the Unrelated Third Parties and Fair and Reasonable clauses as "standards"—contrary to one of the most basic principles of contract interpretation.[272]

In my opinion, based on the plain language of Sections 7.9(a) and 7.9(b), as construed in *El Paso* and *Bandera*, and for the other reasons explained above, the court must look to Section 7.9(a) of the LP Agreement for the appropriate standard to evaluate the General Partner's approval of the Merger because the General Partner faced a conflict of interest when doing so. For the reasons discussed in Part IV, the Special Approval and Unitholder Approval safe harbors were not employed properly in this case and thus are not available to Defendants. Defendants did not pursue an alternative transaction with an unrelated party,[273] and make no argument that approval of the Merger satisfies the Unrelated Third Parties clause. That leaves the Fair and Reasonable standard in clause (iv) of Section 7.9(a) as the operative standard of judicial review. Subject to the court's consideration of whether the

---

[272] *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.").

[273] Tr. 977-78 (Bryant).

conclusive presumption of good faith in Section 7.10(b) applies here, which is discussed next, the court will apply the Fair and Reasonable standard.

**B. Does Section 7.10(b) Apply to Approval of the Merger?**

The parties' second point of disagreement over the contractual standard for Plaintiff's express breach claim is whether the conclusive presumption of good faith in Section 7.10(b) should apply to the General Partner's approval of the Merger. To repeat, Section 7.10(b) states, in relevant part, that "an act taken in reliance upon the opinion" of an investment banker "that the General Partner reasonably believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done . . . in good faith and in accordance with such opinion."[274]

Relying on Vice Chancellor Glasscock's decision in *Morris v. Spectra Energy Partners (DE) GP, LP*,[275] which analyzed the interplay of two provisions nearly identical to Sections 7.9(a) and 7.10(b) of the Regency LP Agreement, Plaintiff argues Section 7.10(b) does not apply to the Merger. The court agrees.

In *Spectra*, like here, Section 7.9(a) of its partnership agreement appeared in a section entitled "Resolution of Conflicts of Interest; Standards of Conduct and Modification of Duties" and Section 7.10(b) appeared in a subsequent section

---

[274] LPA § 7.10(b).

[275] 2017 WL 2774559 (Del. Ch. June 27, 2017).

entitled "Other Matters Concerning the General Partner."[276] Based on the structure and language of the agreement and application of the specific-over-the-general rule of contract interpretation, the court declined to apply the general conclusive presumption in § 7.10(b) to a conflicted transaction in favor of applying the more specific "rebuttable good faith presumption" in § 7.9(a),[277] reasoning as follows:

> It is helpful to note how Section 7.9(a) and Section 7.10(b) interact with one another. On its face, Section 7.10, entitled "Other Matters Concerning the General Partner," appears to cover all matters related to [the general partner] that *other* sections of the LPA do not address. Reaching safe harbor in conflict transactions *is* explicitly laid out in another section: Section 7.9(a) specifically sets forth safe harbors in conflicts situations and grants a rebuttable good faith presumption if a safe harbor is met. The language and structure of the agreement implies that the "good faith" presumption in conflicts situations is intended to be rebuttable, and not as [the general partner] insists, "conclusive." Further, as the Plaintiff correctly points out, "the settled rules of contract interpretation" counsel the Court to prefer Section 7.9(a), a specific provision, over the more general Section 7.10.[278]

Here, Section 7.9(a) of the LP Agreement provides that, if "Special Approval is not sought and the Board of Directors of the General Partner determines that the resolution or course of action taken with respect to a conflict of interest satisfies either of the standards set forth in clauses (iii) or (iv) above [*i.e.*, the Unrelated Third Parties or Fair and Reasonable standards], then it shall be presumed that, in making

---

[276] The LP Agreement does not contain any provision prohibiting use of headings and subheadings to interpret its provisions.

[277] *Spectra*, 2017 WL 2774559, at *10-12.

[278] *Id.* at *11 (citing *Enbridge*, 2017 WL 1046224, at *9).

64

its decision, the Board of Directors of the General Partner acted in good faith."[279]  In my view, it would be illogical to "conclusively presume" good faith in a conflict transaction when the provision specifically dedicated to addressing conflicts of interest only affords a rebuttable presumption of good faith if the General Partner determines that a transaction satisfies either the Unrelated Third Parties or Fair and Reasonable clauses.[280]  Rather, as the court in *Spectra* concluded, it would be far more logical that the provision specific to conflict transactions would govern over a general provision concerning reliance on advisors.

Defendants contend *Spectra* is contrary to the Supreme Court's decisions in *Norton v. K-Sea Transportation Partners L.P.*[281] and *Gerber v. Enterprise Products Holdings, LLC.*[282]  To my reading, however, neither of those decisions squarely

---

[279] LPA § 7.9(a). The partnership agreement in *Spectra* expressly stated in Section 7.9(a) that "[i]f Special Approval is sought, then it shall be presumed that, in making its decision, the Conflicts Committee acted in good faith."  *Spectra*, 2017 WL 2774559, at *7.  This language does not appear in Section 7.9(a) of the LP Agreement, which is silent as to whether approval of a transaction by a properly constituted Conflicts Committee would be entitled to a presumption of good faith, presumably because there is no breach of the LP Agreement if a properly constituted Conflicts Committee approves a conflict of interest.

[280] *See Encore*, 72 A.3d at 103 n.35 (citing *Brinckerhoff v. El Paso Pipeline GP Co.*, C.A. No. 7141-CS, at 11, 20-21, 53-55 (Del. Ch. Oct. 26, 2012) (TRANSCRIPT) for the proposition that "a general conclusive presumption of good faith did not apply when a limited partnership agreement created a rebuttable presumption of good faith applicable to conflict transactions."

[281] 67 A.3d 354 (Del. 2013).

[282] 67 A.3d 400 (Del. 2013) *overruled on other grounds by Winshall v. Viacom Int'l. Inc.*, 76 A.3d 808 (Del. 2013).

addressed the issue raised in *Spectra* and present here, *i.e.*, "whether a general conclusive presumption of good faith arising from reliance on advisors trumped the specific conflict provision's rebuttable presumption of good faith."[283]  Indeed, as the *Spectra* court pointed out, the Supreme Court in *Encore*—which was decided less than two months after *Norton* and *Gerber*—seemed to recognize that this issue remained open when it declined to reach the issue instead of relying on *Norton* and/or *Gerber* as binding authority on the question.[284]

Finally, at most, the interplay of Sections 7.9(a) and 7.10(b) is susceptible to more than one reasonable interpretation and thus is ambiguous.  In that case, given Regency's status as a publicly traded limited partnership before the Merger and the lack of any evidence indicating that the limited partners negotiated the terms of the LP Agreement, ambiguities are resolved "to give effect to the reading that best fulfills the reasonable expectations an investor would have from the face of the

---

[283] *Spectra*, 2017 WL 2774559, at *12.

[284] *See Encore*, 72 A.3d at 103-04, 109 (declining to decide whether "Section 7.10(b)'s generally applicable *conclusive* presumption of good faith does not apply to conflict-of-interest transactions, which the specific safe harbor provision in Section 7.9(a) governs" because plaintiff "failed to plead facts that, if true, would establish that the Conflicts Committee members breached their contractual duty to act in subjective good faith when approving the Merger").

agreement."[285]  In my view, an investor reasonably would expect that the standards set forth in the provision specifically designed to address conflict transactions would govern over a general provision concerning the general partner's reliance on advisers that appears in a section of the LP Agreement titled "Other Matters Concerning the General Partner."

* * * * *

For the reasons explained above, the court concludes that Sections 7.9(b) and 7.10(b) do not apply to the Merger and that the Fair and Reasonable standard in Section 7.9(a) is the standard of judicial review the court must apply to evaluate the General Partner's approval of the Merger.

## VI.  WAS THE MERGER FAIR AND REASONABLE?

In this section, the court analyzes whether the Merger was "fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved."[286]  It bears emphasis that this inquiry focuses on "the Partnership,"

---

[285] *Dieckman*, 155 A.3d at 366 (citing *Bank of New York Mellon v. Commerzbank Cap. Funding Tr. II*, 65 A.3d 539, 551-52 (Del. 2013) (construing an agreement against the drafter to give effect to the "investors' reasonable expectation" using a species of the *contra proferentum* doctrine)); *see also Norton*, 67 A.3d at 360 ("If the contractual language at issue is ambiguous and if the limited partners did not negotiate for the agreement's terms, we apply the *contra proferentem* principle and construe the ambiguous terms against the drafter."); *SI Mgmt., L.P. v. Wininger*, 707 A.2d 37, 42-43 (Del. 1998) (same).

[286] LPA § 7.9(a).

which refers to the entity and not just the limited partners.[287]  Directors thus have "discretion to consider the full range of entity constituencies, including . . . employees, creditors, suppliers, customers, the general partner, IDR holders . . . and of course the limited partners."[288]

"The fair and reasonable standard is 'something similar, if not equivalent to entire fairness review.'"[289]  There are two components to the concept of entire fairness:  fair dealing and  fair price.[290]  Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[291]  Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[292]  "In making a determination as to the entire fairness of the

---

[287] *Enbridge*, 159 A.3d at 259 n.59; *El Paso*, 2015 WL 1815846, at *17 (directors should focus on the "MLP as an entity" and not just what is "good for the holders of common units").

[288] *El Paso*, 113 A.3d at 181.

[289] *Enbridge*, 159 A.3d at 256-57 (quoting *Brinckerhoff v. Enbridge Energy Co., Inc.*, 2012 WL 1931242, at *2 (Del. Ch. May 25, 2012)).

[290] *Weinberger v. UOP, Inc.,* 457 A.2d 701, 711 (Del. 1983).

[291] *Id.*

[292] *Id.*

transaction, the Court does not focus on one component over the other, but examines all aspects of the issue as a whole."[293]

Incorporating Delaware common law principles of entire fairness into the contractual Fair and Reasonable standard raises a question: By what standard should the court evaluate the independence of the directors who approved the Merger, including the members of the Conflicts Committee, when determining if the Merger was fair and reasonable? As discussed in Part IV, the Conflicts Committee did not satisfy the Qualification Provision in the LP Agreement because—whether done intentionally or not—Brannon's position as a Sunoco director overlapped with his service on the Regency Conflicts Committee. Given the holistic and fact-specific approach of Delaware law in considering questions of independence, and consistent with how the court would consider the issue in a traditional entire fairness case, the court will apply Delaware common law principles to this question.

In an entire fairness case, defendants presumptively bear the burden of proof to demonstrate the fairness of the transaction.[294] In the MLP context, this court similarly has placed the burden on defendants to demonstrate that a transaction is

---

[293] *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1180 (Del. Ch. 1999) (Lamb, V.C.), *aff'd* 766 A.2d 437 (Del. 2000).

[294] *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997) (absent a basis to shift the burden of proof, defendants bear burden to prove entire fairness).

fair and reasonable.[295]  In my opinion, although the process certainly was not ideal, Defendants met their burden to demonstrate that the Merger was fair and reasonable to the Partnership.  The following findings of fact, considered in their totality, support this conclusion.  These findings are grouped into two categories for ease of reference, but they are intertwined and must be considered together "consistent with the inherent non-bifurcated nature of the entire fairness standard."[296]

**Fair Dealing**

1. From the beginning of October 2014—before the OPEC announcement—to January 23, 2015, the last trading day before the Merger was announced, Regency's unit price declined by 27.4% while ETP's unit price increased by 2.3%.[297]  When ETP made its initial proposal to acquire Regency on January 16, 2015, the ratio between Regency's and ETP's unit prices was 0.3595, around its two-year low.[298]

---

[295] *In re Energy Transfer Equity*, 2018 WL 2254706, at *2 ("The Defendants failed to effectively take advantage of safe harbor provisions that would have demonstrated, conclusively, compliance with the 'fair and reasonable' standard.  The issue, then, is one of fact, with the burden on the Defendants to demonstrate the fairness of the transaction.").

[296] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1244 (Del. 2012).

[297] *See* PTO Ex. A; PTO Ex. B.

[298] JX 359 at 7.

70

Controlling the timing of a merger is not sufficient by itself, however, to demonstrate unfair dealing by a controller.[299]

2. Regency and ETP both traded in an efficient market and "their unit prices accurately reflected each company's value based on publicly available information in January 2015."[300] The relative trading prices of Regency and ETP's units in mid-January 2015 factored in a historic decline in energy prices that began in 2014, which impacted ETP and Regency in dramatically different ways due to the nature of their businesses, their respective sensitivity to commodity prices, and their respective financial strength:

- Between the OPEC announcement in November 2014 and the announcement of the Merger in January 2015, oil prices declined by nearly 40%.[301] During the six months preceding the Merger announcement, natural gas and NGL prices dropped by approximately 25% and 50% respectively.[302] The downturn exposed Regency to industry-wide and company-specific risks.

[299] *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 599 (Del. Ch. 1986) (Allen, C.) ("[M]ore must be shown, in my view, than that a majority shareholder controlled the timing of the transaction; that will always be true with respect to a transaction involving shareholder approval since, minimally, such a shareholder may veto such a transaction.").

[300] JX 842 ¶ 34; *see* Tr. 1479, 1515 (Dages); *see also* Tr. 424 (Canessa).

[301] JX 854 at 2.

[302] *Id.*; JX 855 at 2; JX 919 at 2.

- The G&P industry was Regency's largest business segment by far, accounting for over 60% of Regency's adjusted EBTIDA in 2014.[303] G&P is more commodity-sensitive than other segments of the midstream market because fees tied to commodity prices are more prevalent in G&P than other segments.[304] "The primary risk for MLPs with gathering assets is declining natural gas prices."[305] By contrast, MLPs with petroleum pipeline, crude oil pipeline, and trucking assets generally provide stable, fee-based cash flow,[306] and interstate natural gas pipeline assets are generally less exposed to economic downturns.[307]

- Regency also faced company-specific exposure to the downturn. As of January 23, 2015, Regency's key financial metrics lagged behind its peers in the G&P space: (i) Regency's debt-to-EBITDA ratio was 4.7x compared to the median of 3.3x; (ii) its distribution yield was 8.5% compared to the median of 7.8%;[308] (iii) its distribution coverage ratio was 0.99x compared to the median of 1.15x; and (iv) its distribution per unit growth was 3.9% compared to the median of 8.9%.[309]

- Analysts identified Regency as among the "MLPs with the most commodity price exposure."[310] Half of Regency's contracts were exposed to volumetric risk,[311] and its fee-based contracts were exposed to the risk that "[a] sustained decline in commodity prices . . . could result in a decline in volumes, and thus, a decrease in

---

[303] *See supra* Part I.B.

[304] JX 260 at 1; JX 79 at 16, 28.

[305] JX 79 at 112.

[306] *Id.* at 137.

[307] *Id.* at 117.

[308] "Generally speaking, a higher distribution yield implies the market's assessment that an investment is riskier, *i.e.*, that the future cash streams are less secure than those of a company with a lower yield." JX 842 ¶ 166.

[309] JX 540 at 13.

[310] JX 256 at 1.

[311] *See* JX 839 ¶ 90.

[its] fee revenues."[312] A January 2015 report Regency commissioned confirmed that the downturn in energy prices was squeezing Regency from both sides—its operations and growth projects simultaneously suffered from reduced revenue expectations and became increasingly expensive to fund.[313]

- ETP was much better positioned than Regency to handle the energy market downturn. First, ETP operated a diverse group of business segments.[314] ETP's transportation and storage segments were less vulnerable to commodity prices,[315] and its significant retail gasoline business was countercyclical to commodity prices.[316] Second, ETP was better positioned to secure additional capital. ETP was an investment-grade firm; Regency was not.[317] In January 2015, ETP's cost of capital was lower than Regency's: ETP's 5-day VWAP LP unit distribution and average 10-year bond yields were 6.45% and 4.00% respectively, compared to Regency's at 9.27% and 5.98%.[318] Third, ETP had a stronger balance sheet than Regency and was better positioned to finance capital programs.[319] In January 2015, ETP had a 3.9x leverage ratio compared to Regency's 4.5x leverage ratio.[320]

- In the fourth quarter of 2014, Regency's distributable cash flow fell 25.5% below budget and its coverage ratio fell to 0.81x, which meant that Regency was not generating enough cash to cover its

---

[312] JX 667 at 21.

[313] Tr. 515 (Bradley); JX 590; Tr. 1119 (Bramhall).

[314] JX 605 at 7.

[315] JX 79 at 117, 119, 137; JX 555 at 9.

[316] JX 555 at 9; Tr. 157-58 (O'Loughlin); *compare* Part I.C, *with* Part I.B.

[317] JX 357 at 2; *see also* PTO ¶¶ 173-78.

[318] JX 555 at 15; JX 416 at 3.

[319] JX 570 at 1; JX 614 at 4.

[320] JX 657 at 5; JX 839 fig. 57.

distribution.[321]  In January 2015, Regency was facing lower unit prices and higher debt yield, which meant it needed to generate a 17.2% IRR instead of a 12.0% IRR to get the same economic return to unit holders.[322]  Regency had a stretched balance sheet, which limited its capacity to fund additional capital expenditures,[323] and its cost of capital was rising.[324]  Regency also had no 2016 natural gas hedges, and could not economically obtain them post-downturn.[325]

3. The market expected the downturn in energy prices to persist for years.

In rejecting calls to cut their oil output in November 2014, OPEC was "bracing for lower prices longer term."[326]  Futures prices for natural gas indicated it would take five or more years for gas prices to return to 2014 levels.[327]  Consistent with this evidence, the Regency directors who approved the Merger justifiably believed that the downturn in energy prices would continue for years and that Regency's unit price was not

---

[321] JX 258 at 5; JX 481 at 4, 5.  The coverage ratio is the ratio between the firm's distributable cash flows and its actual distribution.  Tr. 271, 429 (Canessa).  A coverage ratio below 1.0x requires an MLP to pay out more cash than it has available to pay, necessitating that the MLP borrow funds or raise capital through other means, such as issuing units, in order to maintain its distribution levels.  *See* JX 79 at 26; JX 590 at 38.

[322] JX 590 at 37; Tr. 1123-25 (Bramhall).

[323] JX 570 at 1.

[324] Tr. 532 (Bradley); Tr. 953-54 (Bryant); Tr. 1374 (Gray Dep.); JX 454 at 4.

[325] JX 611 at 3; Tr. 71 (O'Loughlin); JX 555 at 13.

[326] JX 255 at 1.

[327] JX 839 fig. 23; Tr. 173-78, 179-80 (O'Loughlin); *see also* JX 346 at 38.

temporarily or artificially depressed at the time of the Merger negotiations.[328]

4.  The record does not support Plaintiff's contention that ETE/ETP manipulated Regency's unit price to achieve an advantage in the negotiations based on Welch's statements at the Wells Fargo energy symposium in December 2014, the reporting of which was followed by a 2.39% drop in Regency's unit price that day.[329] There is no evidence that ETE/ETP or Regency authorized Welch to make the comments, which displeased Warren and Bradley, and the accuracy of which is not disputed.[330] The comments occurred after Regency had experienced a 18.37% decline in its unit price during the nine trading days (about 2% per day) after the OPEC announcement in November 2014, and were in the public domain and assimilated with other developments in the energy markets for more than a month before ETP made its initial proposal.[331]

5.  As the majority owner of ETE's general partner, Warren had the power to exercise control over both ETP and Regency and had a personal

---

[328] Tr. 497 (Bradley); Tr. 762, 839-40 (Brannon); Tr. 954-55 (Bryant); Tr. 1365 (Gray Dep.).

[329] *See supra* Part I.F.

[330] *Id.*

[331] JX 842 ¶ 27, Exhibit 1.

financial interest to favor the interests of ETP because a combination of ETP and Regency would subject Regency's cash flows to the higher split in ETP's distribution schedule (48%) and was expected to be accretive to ETE.[332] The record does not reflect, however, that Warren abused his position of control to taint the integrity of the process.

6. Warren did not dictate the composition of the conflicts committees for ETP or Regency.[333] And he played no role in the process that lead to the Merger after ETP made its first proposal on January 16, except for the negotiation of IDR givebacks by ETE.[334]

7. Plaintiff suggests Warren corrupted the process by asking Long (Regency's CFO) if he would be interested in serving as the CFO of the combined company and telling Bradley (Regency's CEO) there may be a role for him at ETE post-Merger during the January 16 meeting when ETP delivered its initial merger proposal to them.[335] The record does not indicate that Long or Bradley's judgment during the Merger negotiations was tainted by the prospect of these employment opportunities to favor

---

[332] *See supra* Parts I.A, D.

[333] Tr. 1278 (Warren).

[334] Tr. at 1278-80 (Warren); JX 467.

[335] *See* Pl.'s Opening Post-Trial Br. 24.

ETP or ETE over the interests of Regency.[336] Long did not vote on the Merger and authorized J.P. Morgan to use for its fairness analysis the January Projections, which did not reflect the deterioration in Regency's financial condition during the first quarter of 2015.[337] Bradley's independence is discussed below.

8. Under Delaware law, the "question of independence turns on whether a director is, *for any substantial reason*, incapable of making a decision with only the best interests of the corporation in mind."[338] Measured by this standard, neither Brannon nor Bryant was beholden to Warren so as to call into question their independence.

9. Plaintiff challenges Brannon's independence based on (i) his co-investment with Warren in two businesses (Endevco and OEC) between 1993 and 2001 and (ii) a trip Brannon and his wife took to Warren's ranch in Colorado in 2014 around the time he became a Sunoco

---

[336] *See In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1003-05 (Del. Ch. 2005) (Strine, V.C.) (denying shareholders' request for preliminary injunction when acquirer conveyed to CEO that its bid was contingent on retention of certain unspecified members of management, when the evidentiary record did not reflect that CEO's judgment was tainted by a desire to advantage himself).

[337] *See supra* Part I.K; *see also* Tr. 733 (Castaldo); Tr. 943 (Brannon).

[338] *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 920 (Del. Ch. 2003) (Strine, V.C.) (citation and quotation marks omitted).

director.[339]  This challenge fails.  Brannon exited both investments by 2001 and had no further business dealings with Warren for thirteen years before joining the Sunoco board.[340]  No good reason exists to deviate from the "general rule that past relationships do not call into question a director's independence."[341]  Brannon's limited social interactions with Warren are plainly insufficient to call into question his independence as of the time of the Merger negotiations.[342]

10. Plaintiff challenges Bryant's independence based on a business relationship with Warren concerning Endevco, a company Bryant founded in 1979, which ran into financial trouble.[343]  This challenge also fails.  Warren was part of a group that invested in a reorganization of

---

[339] Pl.'s Opening Post-Trial Br. 20-21.

[340] Tr. 769-70, 862, 863-66 (Brannon).

[341] *In re Freeport-McMoran Sulphur, Inc. S'holder Litig.*, 2005 WL 1653923, at *12 (Del. Ch. June 30, 2005) (Lamb, V.C.); *see also In re KKR Fin. Hldgs. LLC*, 101 A.3d 980, 997 (Del. Ch. 2014) (conclusion that "naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence . . . has particular force . . . where the past business relationship ended *twelve years before* the transaction at issue") (internal quotation marks and citations omitted), *aff'd sub nom.*, *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015)).

[342] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004) ("Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence.").

[343] Tr. 940-42, 961-62 (Bryant).

Endevco in 1993.[344] Bryant was grateful for the opportunity to remain involved in Endevco after the reorganization as a director and/or consultant until 2000,[345] but this decades-old past business relationship is too far removed from his service on the Regency Conflicts Committee to call into question his independence. Bryant also credibly testified that while he views Warren as a friend, he spends little time and is not particularly close to Warren, who is a generation younger than Bryant.[346]

11. Although Plaintiff does not analyze the issue in any detail, he further questions Brannon's and Bryant's independence because they owned ETE units at the time of the Merger,[347] *i.e.*, 17,200 units for Brannon and between 40,000 and 80,000 units for Bryant.[348] The amount Brannon and

---

[344] Tr. 941-42, 962 (Bryant). Bryant could not recall any business dealings with Warren after 2000 beyond a possible immaterial family and friend investment in one of Bryant's partnerships. JX 828 at 41-42 (Bryant Dep.).

[345] Tr. 962-63 (Bryant).

[346] Tr. 961 (Bryant).

[347] *See* Pl.'s Opening Post-Trial Br. 21 (contending that Brannon and Bryant "continued to own thousands of ETE units at the time of the Merger").

[348] PTO ¶ 64 ("Brannon owned 17,200 units of ETE/Energy Transfer when he joined the Regency Board and continued to hold them as of his March 4, 2019 deposition in this case."); *Id.* ¶ 68 ("Bryant owned 80,000 units of ETE/Energy Transfer when he joined the Regency Board and held the majority of that stake as of his March 6, 2019 deposition in this case.").

Bryant stood to gain from the Merger by owning ETE units was insufficient to compromise their independence or disinterestedness.[349]

12. As of January 23, 2015, the last trading day before the Merger was announced, ETE units closed at $27.[350] One analyst estimated the Merger could "result in $5/unit of upside potential to [its] current valuation range for ETE."[351] Brannon's ETE units accounted for less than two percent of his net worth and were immaterial to him;[352] *a fortiori*, the estimated accretion in value of those units was insufficient to compromise Brannon's independence. Plaintiff does not contend that Bryant's ETE units were material to him, and the weight of the evidence indicates they

---

[349] *See In re General Motors Class H S'hlders Litig.*, 734 A.2d 611, 617-18 (Del. Ch. 1999) (Strine, V.C.) ("To show that a GM director's independence was compromised by her ownership of greater amounts of GM $1²/₃ stock, the plaintiffs must plead that the amount of such holdings and the predominance of such holdings over GMH holdings was of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the GMH shareholders without being influenced by her overriding personal interest in the performance of the GM $1²/₃ shares.").

[350] PTO Ex. C (Dkt. 265).

[351] JX 614 at 3.

[352] Tr. 754-55 (Brannon).

were not;[353] *a fortiori*, the estimated accretion in value of his ETE units was insufficient to compromise his independence as well.[354]

13. The substantive negotiations that led to the Merger occurred over a six-day period, from January 20, 2015 to January 25, 2015. Although the negotiations were compressed, the record reflects the parties negotiated efficiently at arm's-length and that a longer period would not have achieved a better result for the Partnership.

14. During the negotiation period, the Conflicts Committee met formally eleven times,[355] worked "[b]efore, between, and after" meetings,[356] and exchanged four proposals with ETP's conflicts committee.[357] Having the parties and their advisors located together at the Lajitas resort facilitated their ability to conduct due diligence (albeit without a data room) and to negotiate quickly as well as to preserve confidentiality, which was a valid

---

[353] Bryant, who was 86 years old at the time of trial, was the CEO of a midstream partnership in 2015 that was unaffiliated with Warren, and had a successful 64-year career in the oil and gas industry, including numerous executive positions and directorships on five public company boards. Tr. 937-43, 948-51 (Bryant); JX 828 at 9 (Bryant Dep.); JX 103 at 4.

[354] Plaintiff does not contend that Brannon and Bryant's board seats at Sunoco or Regency were material to either of them and for the same reasons discussed above concerning their ownership of ETE units, the record would not support such a conclusion.

[355] PTO ¶¶ 106-07, 109, 112-13, 119, 126, 133, 136, 141, 144.

[356] Tr. 814 (Brannon); *see also* Tr. 771, 773 (Brannon).

[357] PTO ¶¶ 127, 130, 133, 137.

concern given that leaks recently had disrupted another transaction involving ETE.[358] Critical to the Conflicts Committee's ability to reach ETP's bottom line in short order is that ETP opened with a reasonable offer and the Conflicts Committee members and their advisors had extensive experience in the industry and were deeply familiar with Regency and ETP.

15. Brannon, who served as the Conflicts Committee's lead negotiator, had over 35 years of industry experience, including as president of two energy companies, and had negotiated more than fifteen energy transactions valued over $100 million.[359] He was very familiar with all the basins in which Regency operated, having invested in or studied every major basin in the United States.[360] Brannon also had followed ETP throughout his career and was familiar with its assets.[361]

16. Bryant had 64 years of experience in the oil and gas industry, the majority of which was in gathering and processing, Regency's largest business

[358] Tr. 705-06 (Castaldo); Tr. 931 (Brannon); JX 361; *see also* Tr. 955-56 (Bryant) ("[I]n this type of a merger, you have to keep very secret because if word of the merger gets out into the market, [the] price will begin to gyrate all over the place and it will be very difficult to come to an agreement on either side of what the merger deal should be.").

[359] JX 301 at 47; Tr. 749, 764 (Brannon).

[360] Tr. 809-10 (Brannon).

[361] Tr. 787-88, 910 (Brannon).

segment.[362]   Brannon considered Bryant to be "one of the premier gathering and processing engineers in the country."[363]   Bryant founded Regency's predecessor in 2004 and had been a Regency director and on its Conflicts Committee since 2010.[364]

17. The Conflicts Committee was advised by one of the largest investment banks in the United States, J.P. Morgan, which quickly assembled an eleven-person team to undertake diligence around the clock.[365]   J.P. Morgan was familiar with Regency before its engagement, having assisted Regency in prior acquisitions and served as the lead banker for its IPO, and members of the J.P. Morgan team "understood the business of Energy Transfer quite well."[366]   The Conflicts Committee also was advised by reputable legal advisors:  Akin Gump as primary counsel and Morris, Nichols, Arsht & Tunnell LLP as Delaware counsel.[367]

18. ETP's initial offer included a .4044 exchange ratio, a $137 million (or $0.36 per unit) cash payment, and an IDR giveback from ETE of $300

---

[362] JX 51 at 52; Tr. 937-43 (Bryant).

[363] Tr. 776 (Brannon).

[364] PTO ¶ 95; Tr. 948-50 (Bryant).

[365] Tr. 702-05, 719-20 (Castaldo).

[366] Tr. 703-05 (Castaldo); Tr. 782 (Brannon).

[367] Tr. 776-77, 780 (Brannon).

million over five years for the post-Merger entity.[368] On January 22, after receiving a presentation from J.P. Morgan concerning ETP's initial offer, which Brannon reviewed "[l]ine by line and page by page," the Conflicts Committee believed they were "starting from a very good spot," especially considering the commodity price environment and Regency's high cost of capital, high leverage, and expected decline in its distribution coverage ratio.[369]

19. After making a counteroffer that ETP rejected, Brannon strategized to secure an exchange ratio that would yield a 15% premium to Regency unitholders, which was realized on January 25.[370] Reflective of their arms-length nature, the negotiations grew heated toward the end, with Welch yelling at Brannon when he would not take his word that ETP's final "take it or leave it" offer would yield the desired 15% premium until J.P. Morgan completed its review of the proposal.[371]

20. The four members of the Regency Board who unanimously approved ETP's Merger proposal after receiving the Conflicts Committee's

---

[368] PTO ¶ 99; Tr. 814-15 (Brannon).

[369] JX 454 at 3-4; Tr. 815, 824-825 (Brannon).

[370] Tr. 826-28, 840-46, 851 (Brannon).

[371] Tr. 842-44 (Brannon); Tr. 1166, 1171-72 (Grimm); JX 920 at 254 (Grimm Dep.).

recommendation were Bradley, Brannon, Bryant, and Gray.[372] Brannon and Bryant were independent under Delaware law standards for the reasons discussed above. The same is true for Bradley and Gray. They both had worked at energy companies for decades; joined the Regency Board in 2008, before ETE acquired Regency's general partner from General Electric in 2010; and had no previous employment relationship with Warren or ETE.[373]

21. Plaintiff contends that "Bradley's financial well-being [was] dependent on Warren's continued favor."[374] Bradley credibly testified, however, and logic suggests, that other opportunities were available to him after the Merger as a former public company CEO that were not dependent on his relationship with Warren.[375]

22. Gray left the Conflicts Committee to ensure its compliance with NYSE rules when he became the CFO of a small customer of Regency and not for any reason that would call into question his independence under Delaware law to make an impartial evaluation of the proposed

---

[372] JX 537 at 2.

[373] PTO ¶¶ 58, 69; Tr. 576 (Bradley); JX 833 at 25-33 (Bradley Dep.); JX 815 at 32, 58-59 (Gray Dep.); JX 62 at 109-10.

[374] Pl.'s Opening Post-Trial Br. 20.

[375] Tr. 580-82 (Bradley).

transaction.[376] Gray did not know Warren before he joined the Regency Board and had no interactions with Warren other than when Warren occasionally attended Regency Board meetings as a non-member.[377]

23. As discussed in Part IV, the Proxy was false in two respects directly relating to Brannon's overlapping service on the Conflicts Committee and the Sunoco board. But no showing has been made that the disclosures in the Proxy were deficient in describing Regency and ETP's financial condition, the economics of the proposed Merger, or J.P. Morgan's analysis of the same.[378]

**Fair Price**

24. The transaction the Conflicts Committee and the Board approved on January 25, 2015—an exchange ratio of 0.4066 plus $0.32 in cash per common unit—implied a value of $26.89 per unit, which yielded Regency unitholders a 15.3% premium to Regency's three-day VWAP of $23.33 and premium of $3.14 per unit to Regency's last closing price: $23.75 as of January 23, 2015.[379] The transaction also included an IDR giveback from ETE of $320 million over five years ($80 million in the

---

[376] *See supra* Part I.H.

[377] JX 815 at 32, 58-59 (Gray Dep.).

[378] *See supra* Part IV.

[379] JX 540 at 5, 6.

first year and $60 million each of the next four years) for the post-Merger entity.[380]

25. The analysis J.P. Morgan presented to the Conflicts Committee when providing its fairness opinion on January 25, 2015, supports the fairness of the Merger consideration to Regency. The "crux" of J.P. Morgan's analysis was a football field that demonstrated the "transaction was fair" when comparing what Regency unitholders "were giving versus what [they] were getting" because the exchange ratio (0.4115 when including the cash component) "was comfortably to the right of just about all of [the] bars" in the chart, which represented (a) analyst price targets, (b) a dividend discount model, and (c) seven public company comparisons: (i) Firm Value to 2015E EBITDA, (ii) Firm Value to 2016E EBITDA, (iii) LP Equity Value to 2015E DCF per unit, (iv) LP Equity Value to 2016E DCF per unity, (v) current yield, (vi) 2015E yield, and (vii) 2016E yield.[381]    J.P. Morgan's dividend discount model used the January

---

[380] Tr. 931 (Brannon).

[381] JX 540 at 20; Tr. 737-39 (Castaldo); Tr. 820-21 (Brannon). As used here, "DCF" refers to distributable cash flow.

Projections—which Plaintiff endorses[382]—even though they "may have turned out to be overly optimistic" according to J.P. Morgan.[383]

26. The positive market reaction to the Merger's announcement corroborates its fairness to Regency. On January 26, 2015, the date the Merger was announced, Regency's unit price increased 5% and ETP's unit price fell 6.4% even though Regency announced a flat distribution while ETP announced a $0.02 distribution increase for the quarter.[384] Shortly after the announcement, numerous analysts reported that the Merger was positive for Regency.

27. In an article titled "ETP Providing Shelter from the Storm," UBS viewed the Merger "as a positive for RGP" given the "premium paid," synergies, and the "Investment Grade rating of ETP which RGP will benefit from" given that the "capital markets are almost closed for anyone below [investment grade]."[385] Wells Fargo similarly viewed the Merger "positively for RGP" because its "prospects for the coming year [were] more challenging given lower commodity prices (and potentially volumes)" and Regency "would have been challenged to finance an

---

[382] *See* Pl.'s Reply Br. 19 (Dkt. 308).

[383] Tr. 733 (Castaldo).

[384] JX 570 at 1; JX 580 at 1; JX 842 Appendix C-6, at 152, 163.

[385] JX 568 at 2.

estimated $1.5B 2015 capital program on its own."[386]  Credit Suisse commented that the Merger would alleviate concerns about Regency "having to use a weakened currency and stretched balance sheet to continue to fund a large capex budget . . . by moving to a more financially stable ETP platform."[387]  Morgan Stanley reported: "Given RGPs current cost of capital, the current circumstances dictated the timing as projects were no longer accretive" and ETP provided "an attractive platform to help subsidize weakness likely to persist at Regency, absent a material rally in oil and/or natural gas."[388]

28. Proxy advisory services also concluded the Merger was positive for Regency despite awareness of the same criticisms of the transaction Plaintiff has asserted.  Institutional Shareholder Services (ISS) noted in its advisory report that Regency's price had declined relative to ETP's and that the Merger was dilutive for Regency unitholders but accretive to ETE.[389]  ISS nevertheless recommended the Merger for its "strong" business rationale, lowered borrowing costs, and "all-equity" consideration allowing Regency unitholders "to capture upside exposure

---

[386] JX 614 at 4.

[387] JX 570 at 1.

[388] JX 587 at 2.

[389] JX 691 at 1, 4-5.

in a natural gas rebound."[390]  Glass Lewis recommended the Merger, explaining that "Regency investors will gain exposure to a substantially larger and more diversified midstream enterprise."[391]

29. The Amendment to replace the $0.32 cash payment with $0.32 ETP units did not change the economics or fairness of the transaction to Regency's common unitholders and does not call into question the substance of J.P. Morgan's fairness analysis.  As J.P. Morgan informed the Conflicts Committee, it did not need to update its fairness opinion in response to the Amendment because it concerned an immaterial amount (about 1.5%) of the total Merger consideration.[392]

30. Plaintiff challenges the fairness of the Merger because it was significantly accretive to ETE—and to Warren personally—due to the fact that Regency's legacy cash flows would be distributed after the Merger in the top tier of ETP's IDR schedule, which governed the post-Merger entity.[393]  The argument that the transaction "did not benefit the limited partners enough relative to what the General Partner received"[394]

[390] *Id.* at 2, 9.

[391] JX 693 at 5.

[392] JX 635 at 2; Tr. 695-96, 741 (Castaldo).

[393] *See supra* Part I.D.

[394] *El Paso*, 113 A.3d at 178.

does not square with the Fair and Reasonable standard in the LP Agreement, which focuses on what is "fair and reasonable *to the Partnership*."[395] Put differently, that the Merger also benefited ETE does not negate that it provided substantial benefits and was fair to Regency.

31. In a related line of argument, Plaintiff seizes on Bryant's testimony that it was "our" intent that the transaction not dilute ETP's unitholders.[396] Read in context, Bryant's testimony reflects the dynamics of the overall negotiations: avoiding dilution was ETP's priority in the negotiations while the Conflicts Committee's priority was securing an exchange ratio that would yield a 15% premium to Regency's unitholders when combining Regency with a more diversified and financially stable ETP. When it obtained an offer with a 15% premium, the Conflicts Committee had hit ETP's reserve price and was faced with a "take it or leave it decision.[397]

32. The fundamental question facing the Conflicts Committee and the Board in January 2015 was whether Regency should remain a standalone entity

---

[395] LPA § 7.9(a) (emphasis added). *See Kinder Morgan*, 2015 WL 4975270, at *4, *8 (dismissing claim that a conflicts committee should have "extracted greater consideration relative to" the general partner where the partnership agreement's "operative tests focus on the Partnership").

[396] Pl.'s Opening Post-Trial Br. 27.

[397] Tr. 1166, 1171-72 (Grimm); JX 920 at 254 (Grimm Dep.).

or would be better off as a combined entity with ETP given the Partnership's deteriorating prospects by undertaking a transaction that would allow Regency unitholders to exchange their units for units of ETP at a 15% premium to the market at the time. The Conflicts Committee and the Board were well aware of the accretion ETE was expected to receive in the transaction,[398] the accretion/dilution implications of the Merger on ETP and Regency, respectively, and made an informed, impartial decision that its terms nevertheless were fair and reasonable to the Partnership based on legitimate considerations. For example, the Conflicts Committee:

- Expected that the downturn in energy prices would be prolonged, Regency's unit price would continue to struggle, and its cost of capital would remain high[399] while, on the other hand, ETP was a larger, more diversified investment-grade company and was better positioned to weather the downturn.[400]

---

[398] *See, e.g.*, JX 540 at 21; Tr. 37 (O'Loughlin); Tr. 848, 926-27 (Brannon); Tr. 1009 (Bryant).

[399] Tr. 829-30, 837-39, 933-34 (Brannon); Tr. 956 (Bryant).

[400] Tr. 818-20 (Brannon); Tr. 957 (Bryant); Tr. 722-24 (Castaldo); JX 464 at 14.

- Believed Regency "would have a hard time meeting [management's] projections" and maintaining its distributions unless energy prices recovered [401] while, by comparison, ETP's distributions were far less risky, as ETP's lower yield rate and higher growth rate reflected.[402]

- Believed Regency's backlog of growth projects could be executed more profitably with ETP's lower cost of debt and its unitholders would receive equity in a combined entity with far less G&P exposure and a greater percentage of fee-based revenue.[403]

33. Consistent with these considerations, Regency's performance deteriorated further between signing (January 25, 2015) and closing (April 30, 2015). For the first quarter of 2015, Regency's distributable cash flow fell 17% below the January Projections (while ETP exceeded its internal distributable cash flow projections by 7.6%), its coverage ratio declined to 0.77x, and its leverage ratio climbed to 5.26x.[404] As of April 30, Regency was projecting that its distributable cash flow for 2015 would fall 33% below the January Projections and that its leverage ratio would rise further and trigger a default of its bank covenants.[405]

---

[401] Tr. 837-39, 933 (Brannon); Tr. 954-57 (Bryant); JX 454 at 3, 4.

[402] Tr. 720-22 (Castaldo); JX 540 at 13, 18.

[403] JX 416 at 3; JX 608 at 13; Tr. 790-98, 800-804 (Brannon).

[404] *See supra* Part I.K.

[405] *Id.*

34. Observing that the exchange ratio ultimately yielded a 0.3% premium when the Merger closed based on the market price of Regency units at the time, Plaintiff contends the 15% premium was "illusory" because the Conflicts Committee did not secure a collar.[406] Empirical data show that using a collar in an oil and gas transaction is exceedingly rare: Since January 1, 2000, only 6 out of 968 acquisitions of oil and gas companies contained a collar.[407] The Conflicts Committee discussed using a collar with J.P. Morgan but reasonably decided not to seek one after J.P. Morgan said "they were unaware of anyone using a collar in this type of transaction" and taking into account that seeking a collar realistically would prompt demands for and require significant concessions.[408]

35. Finally, as discussed in Part VIII, the damages evidence presented at trial confirms the fairness of the Merger consideration. In analyzing the "give-get" of the Merger, Plaintiff's expert could only demonstrate damages by relying on an illogical apples-to-oranges comparison of Regency's DDM value to the market price of ETP's units. Any comparison of DDM-to-DDM or market-to-market yielded no damages.

---

[406] Pl.'s Reply Br. 14.

[407] Tr. 1530-31 (Dages).

[408] Tr. 853-54 (Brannon); *see also* Tr. 733-34 (Castaldo).

For the reasons explained above, Defendants satisfied their burden to demonstrate that the Merger satisfied the Fair and Reasonable standard in Section 7.9(a) of the LP Agreement. Accordingly, Defendants are entitled to judgment in their favor on Count I of the Amended Complaint.

## VII. ARE DEFENDANTS LIABLE FOR DAMAGES?

In Part V, the court concluded that the General Partner breached the implied covenant of good faith and fair dealing inherent in the Special Approval and Unitholder safe harbors of Section 7.9(a) of the LP Agreement. To determine whether the Class may recover damages for this breach, the court must next consider whether the General Partner is exculpated from damages under Section 7.8(a) of the LP Agreement. That provision states, in relevant part, that the General Partner shall not "be liable for monetary damages to the . . . the Limited Partners . . . for losses sustained . . . as a result of any act or omission of an Indemnitee unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of the matter in question, the Indemnitee acted in bad faith or engaged in fraud [or] willful misconduct."[409]

The LP Agreement does not define the term "bad faith" but it does define "good faith" as a "belie[f] that the determination or other action is in the best interest

---

[409] LPA § 7.8(a).

of the Partnership."[410]   As discussed in Part III, this is a subjective standard. Construing a partnership agreement containing the same definition of "good faith" and a provision substantively identical to Section 7.8(a) of the LP Agreement,[411] our Supreme Court explained in *Allen v. Encore Energy Partners, L.P.* that a breach of the "duty of subjective good faith" means that a person (i) "believed it was acting against [the partnership's] best interest" or (ii) "consciously disregarded its duty to form a subjective belief that the [action taken] was in [the partnership's] best interests."[412]   The court adopts this standard as the test for demonstrating bad faith in the LP Agreement.

The LP Agreement also does not define the term "willful misconduct" and the parties have not cited any authority construing that term.  The Delaware Statutory Trusts Act defines "willful misconduct" as "intentional wrongdoing, not mere negligence, gross negligence or recklessness" and defines "wrongdoing" to mean "malicious conduct or conduct designed to defraud or seek an unconscionable advantage."[413]   The court adopts this standard.  As to fraud, it is bedrock Delaware

---

[410] *Id.* § 7.9(b).

[411] *Encore*, 72 A.3d at 101-02.

[412] *Id.* at 106.

[413] 12 *Del. C.* § 3301(g).

law that fraud requires intentional wrongdoing.[414]  In short, use of the terms bad

faith, willful misconduct, and fraud in Section 7.8(a) indicate that, to avoid the

exculpatory provision in Section 7.8(a) of LP Agreement, Plaintiff must prove by a

preponderance of the evidence that the General Partner not only acted in a manner

inimical to Regency's best interests, but did so with *scienter*.

"An entity . . . can only make decisions or take actions through the individuals

who govern or manage it."[415]  Here, it is the Board that governs and manages the

General Partner and, in turn, Regency.[416]  Thus, determining whether the General

Partner acted in bad faith or engaged in fraud or willful misconduct turns on the state

of mind of the directors on the Board who voted to approve or otherwise authorized

a challenged action.[417]  Consistent with the default rules governing the Board, to the

extent the directors who voted to approve an action had different states of mind with

respect to a particular matter, the determination of whether the General Partner acted

---

[414] *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 49 (Del. Ch. 2015) (elements of fraud are: "(i) a false representation, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth, (iii) the defendant's intention to induce action based on the representation, (iv) reasonable reliance by the plaintiff on the representation, and (v) causally related damages") (citing *Stephenson v. Capano Dev., Inc.* 462 A.2d 1069, 1074 (Del. 1983)).

[415] *Gerber v. EPE Hldgs*, 2013 WL 209658, at *13 (Del. Ch. Jan. 18, 2013).

[416] *See supra* Part I.A.

[417] *Encore*, 72 A.3d at 107 ("[T]he ultimate inquiry must focus on the subjective belief of the specific directors accused of wrongful conduct."); *see also El Paso*, 2015 WL 1815846, at *16.

with *scienter* inimical to the Partnership's interests would turn on the state of mind of a majority of directors who voted to approve the challenged action.[418]

Before turning to Plaintiff's arguments for why the General Partner should not be exculpated under Section 7.8(a), the court addresses a threshold issue Plaintiff has raised, which is whether Defendants waived Section 7.8(a).

## A.     Did Defendants Waive Section 7.8(a)?

Plaintiff contends that Defendants waived Section 7.8(a) of the LP Agreement by not pleading it in their answer as an affirmative defense.[419]  Defendants do not dispute they did not plead Section 7.8(a) as an affirmative defense in their answer. Their position is that Section 7.8(a) "is part of Plaintiff's cause of action" and "is not an affirmative defense."[420]  Defendants have the better of the argument in my view based on the reasoning of the authority on which Plaintiff primarily relies:  then Vice-Chancellor Strine's decision in *In re Nantucket Island Associates Limited Partnership Unitholders Litigation.*[421]

---

[418] Defs.' Supp. Br. Ex. 6 § 7.7 ("Any act of the majority of the Directors present at a meeting at which a quorum is present shall be the act of the Board.").  *See also Amtower v. Hercules Inc.*, 1999 WL 167740, at *8 (Del. Super. Feb. 26, 1999) (Quillen, J.) (defining "majority vote" as "more than half of the votes cast by persons legally entitled to vote, excluding blanks or abstentions, at a regular or properly called meeting at which a quorum is present." (quoting Henry M. Robert, Robert's Rules of Order 395 (9th ed. 1990)).

[419] Pl.'s Opening Post-Trial Br. 43-44, 70.

[420] Defs.' Post-Trial Br. 43.

[421] 2002 WL 31926614 (Del. Ch. Dec. 16, 2002).

In *Nantucket Island*, the court found that Section 17-1101(d)(1) of the Delaware Revised Uniform Limited Partnership Act constituted an affirmative defense that "falls within the ambit of Rule 8(c)."[422] That rule requires a defendant responding to a complaint to set forth "any . . . matter constituting an avoidance or affirmative defense."[423] In reaching this conclusion, the court explained that the statute "permits . . . fiduciaries of limited partnerships to 'avoid' liability for what might otherwise be a breach of legal or equitable duty," emphasizing that "[o]n its face, [the statute] would seem to require a showing *by the defendants* that they acted in 'good faith reliance' on the partnership agreement if they are to avoid liability."[424]

In other words, the court in *Nantucket Island* reasoned that because overcoming the "good faith reliance" provision in the statute was not part of plaintiff's affirmative case, plaintiff was entitled to receive notice "early on in the case" if defendants intended to invoke the defense so that plaintiffs would have a fair opportunity to create a factual record to respond.[425] To not receive early notice would leave plaintiffs "vulnerable to severe prejudice," contrary to the policy underlying Rule 8(c).[426]

---

[422] *Id.* at *2.

[423] Ch. Ct. R. 8(c).

[424] *Nantucket Island*, 2002 WL 31926614, at *2.

[425] *Id.* at *2-3.

[426] *Id.* at *3.

Here, in contrast to the statute at issue in *Nantucket Island*, the plain language of Section 7.8(a) of the LP Agreement does not suggest it is Defendants' burden to prove anything by way of a defense. Section 7.8(a) is a declarative sentence. It informs the reader that: "Notwithstanding anything to the contrary set forth in this Agreement," an Indemnitee shall not be liable for monetary damages unless "the Indemnitee acted in bad faith or engaged in fraud [or] willful misconduct."[427] Construing an exculpatory provision similar to Section 7.8(a), our Supreme Court impliedly determined that the provision was part of plaintiff's cause of action when it held that "[plaintiff] must plead facts" that the "[general partner] did not act in good faith."[428]

As a linguistic matter, it also is not clear how the plain language of Section 7.8(a) could operate as an affirmative defense. To repeat, that provision depends, in relevant part, on "a final and non-appealable judgment . . . that . . . the Indemnitee acted in *bad faith*."[429] Plaintiff's argument, however, only would make sense if

---

[427] LPA § 7.8(a).

[428] *Enbridge*, 159 A.3d at 260; *see also In re K-Sea Transp. P'rs L.P. Unitholders Litig.*, 2012 WL 1142351, at *6 (Del. Ch. Apr. 4, 2012). The exculpatory provision at issue in *Enbridge* stated: "Notwithstanding anything to the contrary set forth in this Agreement, no Indemnitee shall be liable for monetary damages to the Partnership, the Limited Partners, the Assignees or any other Persons who have acquired interests in the Units, for losses sustained or liabilities incurred as a result of any act or omission if such Indemnitee acted in good faith." *Enbridge*, 159 A.3d at 258.

[429] LPA § 7.8(a) (emphasis added).

100

Section 7.8(a) required a judicial finding of *good faith*, *e.g.*, to obtain exculpation from a transaction found not to be fair and reasonable under Section 7.9(a), the General Partner affirmatively would have to prove its good faith—not its bad faith.

Tacitly recognizing that Section 7.8(a) was part of any cause of action to recover monetary damages under the LP Agreement, the Amended Complaint asserted that the General Partner "breached the MLP Agreement" because it acted in bad faith, *i.e.*, it "did not believe that the Merger was[] in the best interest of the Regency Partnership."[430] Plaintiff then litigated his case accordingly, seeking evidence in discovery and eliciting testimony at trial concerning the directors' state of mind, discussed below. Indeed, Plaintiff's counsel candidly acknowledged at the pretrial conference it was Plaintiff's burden to prove that Defendants' conduct fell outside the exculpatory protection of Section 7.8(a): "We know we have the burden to prove a breach of contract. We know we have the burden to prove damages. We know we have the burden to prove willful misconduct or bad faith or fraud under LPA Section 7.8."[431]

Given these circumstances and, most importantly, the plain text of Section 7.8(a), the court concludes that proving that the General Partner's acts or omissions fall within one of the categories enumerated in Section 7.8(a) for which monetary

---

[430] Am. Compl. ¶ 149.

[431] Pretrial Conference Tr. 30 (Dkt. 300).

damages may be recovered is a necessary element of a cause of action to recover damages against the General Partner under the LP Agreement and not an affirmative defense that must be pled under Court of Chancery Rule 8(c). Accordingly, Defendants did not waive the requirements of Section 7.8(a).

**B.    Does Section 7.8(a) Bar the Class from Obtaining Monetary Damages from Defendants?**

As discussed in Part VIII below, Plaintiff seeks an award of damages exceeding $1.6 billion on the theory that the members of the Class gave up shares of Regency worth more than the value of the ETP shares they received in the Merger. Plaintiff argues Defendants should not be exculpated under Section 7.8(a) from liability for damages of this magnitude to compensate the Class for inadequate Merger consideration for essentially two reasons, *i.e.*, because Defendants (i) "willfully created a conflicted Conflicts Committee" and (ii) "issued a Proxy misrepresenting Brannon and Bryant as 'independent directors' without disclosing Brannon's Sunoco Board membership."[432]

Embedded in Plaintiff's argument are two questions. The first is whether either of the actions he challenges was the product of bad faith, willful misconduct, or fraud. The second question is whether, even if one or both of the challenged

---

[432] Pl.'s Opening Post-Trial Br. 70-71. Plaintiff also asserts that Defendants "willfully changed the Merger consideration to avoid disclosing J.P. Morgan's reports, including its accretion/dilution analyses. *Id.* at 71. For the reasons explained in Part IV, *supra*, this contention is without merit.

actions was the product of bad faith, willful misconduct, or fraud, would damages intended to compensate the Class for inadequate Merger consideration necessarily follow without any further inquiry. The court addresses these questions in turn.

### 1. Does the Record Support Plaintiff's Theories for Avoiding Exculpation under Section 7.8(a)?

Plaintiff's primary contention is that Defendants acted in bad faith because "the Regency Board *knew* Brannon was a Sunoco Board member when he was appointed to the Conflicts Committee."[433] Having carefully considered the circumstances of Brannon's appointment and the cited evidence, the court concludes that the preponderance of the evidence does not support Plaintiff's assertion that the Board acted in bad faith in appointing Brannon to the Conflicts Committee.

As an initial matter, the context of Brannon's appointment is telling. Brannon was asked to join the Conflicts Committee (as well as the Audit & Risk Committee) to fill a vacancy after the Board had "determined it is in the best interests of the Partnership and the Company to accept" Gray's resignation from the committee out of concern that Gray would not meet the independence standards of the NYSE rules because he had become the CFO of a small Regency customer and thus may run

---

[433] *Id.* at 45, 71. Plaintiff also challenges Bryant's appointment to the Conflicts Committee. *Id.* at 71. But the Conflicts Committee was a standing committee to which Bryant had been appointed before ETP made a proposal to acquire Regency. Tr. 874 (Brannon); JX 364 at 1). Plaintiff provides no evidence relevant to that appointment to call into question Bryant's adherence to the qualification requirements in the LP Agreement or his independence under Delaware law.

afoul of the Qualification Provision.[434] No argument is made, and the court can conceive of none, that Gray's position as CFO of a small Regency customer would have called into question Gray's impartiality under Delaware law to negotiate a potential ETP-Regency merger. Nor has any argument been made that Gray was opposed to a merger of ETP and Regency. The concern arising from Gray's participation on the Conflicts Committee was to ensure that its membership complied with Regency's governance provisions. Given that context, it is illogical that the Board, having just accepted Gray's resignation to ensure compliance with those provisions, immediately would turn around and *intentionally* flout those provisions in connection with Brannon's appointment.

In fact, an email that Regency's Corporate Counsel (Jaclyn Thompson) sent on December 10, 2014, around the time Gray's ability to satisfy the Qualification Provision came into question, suggests Regency took that provision seriously and intended to make sure Brannon was qualified to serve on the Conflicts Committee:

---

[434] JX 373 at 3; *see also supra* Part I.H.

We are still waiting to confirm facts surrounding [Gray's] status on our board. I spoke with Tom about an hour ago and no decisions have been made. *If we go this route, we will send Dick [Brannon] an intake questionnaire. His independence is key* as losing [Gray's] independence would be the driving point behind appointing a new director (and maintaining NYSE and SEC compliance). Specifically, we would have to appoint an independent director to fill the vacancy on our audit committee. Latham is drafting a variety of board [resolutions] for us so that we are ready to quickly pitch this to our board to render final/formal determinations once we definitely know the facts re [Gray's] situation and, if necessary, his replacement.[435]

As of December 22, Gray's status remained uncertain and Thompson had begun to review Brannon's D&O questionnaire to determine his eligibility to serve on the Conflicts Committee.[436]

Turning to the evidence of the directors' knowledge Plaintiff has cited, the record does not support Plaintiff's assertion that all of the directors who approved Brannon's appointment on January 17 (Bradley, Bryant, McReynolds, and Ramsey) knew *at that time* that Brannon was still a Sunoco director:

- Bradley testified he knew Brannon was on the Sunoco board as of December 14, 2014, more than a month before his appointment to the Conflicts Committee, and that he believed Brannon was independent and qualified to sit on the Conflicts Committee when the Board appointed him to that position in January.[437]

---

[435] JX 280 at 1 (emphasis added).

[436] *See* JX 302.

[437] Tr. 585-86, 658 (Bradley).

105

- Bryant testified he knew Brannon was on the Sunoco board as of January 16, 2015,[438] the date of a Regency Board meeting where adding Brannon to the Conflicts Committee was discussed. But Bryant was not asked if that was still the case the next day, on January 17, when he and the other directors approved the written consent for Brannon's appointment.

- In a confusing line of questioning, McReynolds testified during his deposition in 2019 that he did not remember (based on his then-present recollection) when Brannon joined the Sunoco board but assumed for purposes of a question that Brannon was on the Sunoco board when Brannon's name came up as a candidate to replace Gray—the date of which is not specified but which had occurred by December 2014.[439]

- When shown a copy of Brannon's January 20, 2015 letter of resignation from the Sunoco board during his deposition in 2019, Ramsey testified (based on his then-present recollection) that Brannon resigned from the Sunoco board "around this time."[440] Ramsey was not asked whether he knew Brannon was still a Sunoco director when he approved the written consent on January 17, 2015.

Bradley, McReynolds, and Ramsey's testimony does not support Plaintiff's assertion that they knew *at the time Brannon was appointed to the Conflicts Committee on January 17* that he was still a director of Sunoco. Bryant's testimony that he knew Brannon was on the Sunoco board as of January 16 is sufficiently close in time to when the directors approved the written consent on January 17 to support such an inference, but there is to my mind another, more logical inference. The other

---

[438] Tr. 971 (Bryant).

[439] JX 820 at 283-84 (McReynolds Dep.).

[440] JX 814 at 216-17 (Ramsey Dep.).

directors on the Board at the time testified, as would be entirely logical, that they had or would have relied on Regency's counsel to vet Brannon's qualifications.[441] It stands to reason Bryant would have done so as well and believed when he received the written consent from Regency's in-house counsel (Thompson) on January 17 that Brannon's eligibility to serve on the Conflicts Committee had been confirmed by counsel.[442] Notably, there is no evidence that Bradley, Bryant, McReynolds, and/or Ramsey knew on January 17 that Brannon had been told by ETE's counsel to hold off from resigning from the Sunoco board after he offered to do so that weekend.[443]

---

[441] *See* JX 833 at 291-92 (Bradley Dep.) ("Q. During Project Rendezvous, do you recall any discussion with anybody regarding the implications of Brannon being on the Sunoco LP board? A. During. Yeah, our counsel vetted everything, what was going on. And I relied on their counsel as to whether or not, you know, he was independent."); JX 820 at 291 (McReynolds Dep.) ("I believe . . . that the General Counsel of Regency would have vetted [Brannon], or someone at [ETE] would have vetted him."); Tr. 1377-78 (Gray Dep.) ("Question: Back in January 2015, were you comfortable that Mr. Brannon and Mr. Bryant were independent for purposes of serving on the conflicts committee? Answer: I – again, with the advice of counsel, they were judged independent, and in my view of their analysis, questions, and – and statements, I felt they were acting independent."); JX 814 at 149-50 (Ramsey Dep.) ("But I think the actual qualification process for Regency would have taken – taken place with Todd Carpenter, who was the general counsel at Regency at the time, to ensure that [Brannon] would, you know, pass the New York Stock Exchange rules for serving as an independent director.").

[442] The January 16 Board meeting began at 2 p.m. Thompson emailed the written consent to the directors at 4:44 p.m. on January 17. JX 364 at 1; JX 373 at 1. The written consent was approved by return email on January 17 as follows: Bryant (5:07 p.m.), Bradley (5:11 p.m.), Ramsey (5:13 p.m.), and McReynolds (10:15 p.m.). JX 378; JX 379: JX 380.

[443] Tr. 870-71 (Brannon).

As this court has noted, "[w]ithout the ability to read minds, a trial judge only can infer a party's subjective intent from external indications."[444] Considering the record in its totality, the court finds that the weight of the evidence supports the inference that the directors who approved Brannon's appointment to the Conflicts Committee did not intend to violate the Qualification Provision and, to the contrary, that they subjectively believed they were acting in Regency's best interests when they appointed Brannon to take Gray's place on the Conflicts Committee in order to ensure compliance with that provision. As it turns out, Brannon's appointment was mishandled—apparently at the hands of lawyers tasked with its implementation— and caused a breach of the implied covenant of good faith and fair dealing because his service on the Conflicts Committee and Sunoco board overlapped. That breach was an issue of strict liability. Insofar as the directors' mental state is concerned, it is more likely than not that the failure to secure Brannon's resignation from the Sunoco board before his appointment to the Conflicts Committee was not intentional.

Plaintiff's second contention is that "Defendants . . . committed fraud by knowingly issuing a false and misleading Proxy."[445] To be sure, the Proxy contained two false statements directly relating to Brannon's overlapping service on the

---

[444] *El Paso*, 113 A.3d at 178.

[445] Pl.'s Reply Br. 41.

Sunoco board and the Conflicts Committee.[446] But Plaintiff has failed to provide any evidence that the directors who approved the Merger and authorized the issuance of the Proxy—Bradley, Brannon, Bryant, and Gray—knew that the Proxy contained those false statements.[447]

During the meeting when the Board approved the merger on January 25, 2015, the Board authorized Bradley (as Regency's CEO) and certain other officers to prepare, execute, and file the Proxy.[448] There is no evidence that the other directors (Brannon, Bryant, and Gray) played any role in the preparation of the Proxy, much less that they were aware of the two false statements in it. Bradley signed the Proxy,[449] but again, Plaintiff provides no evidence that he (or any other Regency officer who may have been involved in preparing the Proxy) was aware that it contained the two false statements. Plaintiff's contention that Defendants perpetrated a fraud with respect to the Proxy thus fails for lack of evidence of *scienter*.

---

[446] *See supra* Part IV.

[447] *See In re TrueCar, Inc. S'holder Deriv. Litig.*, 2020 WL 5816761, at *13 (Del. Ch. Sept. 30, 2020) ("[T]o adequately allege that a director faces a substantial likelihood of liability for disclosure violations, the plaintiff must plead specific factual allegations showing 'that the director defendants had knowledge that any disclosures or omissions were false or misleading.'" (quoting *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 134 (Del. Ch. 2009))).

[448] JX 537 at 3-4.

[449] Proxy at 4.

## 2. Would Plaintiff's Theories for Avoiding Exculpation Support His Theory of Damages?

The next question the court considers, for the sake of completeness, is whether damages to compensate the Class for inadequate Merger consideration automatically would follow if Plaintiff had established that the Board's decision (i) to put Brannon on the Conflicts Committee and/or (ii) to disseminate a Proxy containing two false statements was the product of bad faith, willful misconduct, or fraud. Plaintiff asserts the answer to this question is yes as if that were obvious.

Defendants counter that: "[T]he only 'determination' for which Plaintiff seeks relief is the Merger's approval. Thus, in selecting which subjective beliefs to evaluate, the Court focuses on this determination alone, even if there are ancillary determinations."[450] For support, Defendants rely on the Supreme Court's *Encore* decision, where it explained that because plaintiff's "only claim is that the Merger was unfair and undertaken in bad faith, [the acquirer's] allegedly value-depressing disclosures are relevant only insofar as they resulted in an unfair exchange ratio for the Merger itself."[451]

In my view, given that the relief Plaintiff seeks is monetary damages intended to remedy an allegedly unfair exchange ratio, the court's focus in determining

---

[450] Defs.' Supp. Br. 2.

[451] 72 A.3d at 110.

110

whether Defendants are not entitled to exculpation under Section 7.8(a)—whether it be for an express breach of the LP Agreement or a breach of the implied covenant of good faith and fair dealing inherent therein—logically should turn on Defendants' state of mind on the issue that provides the rationale for damages: the fairness of the Merger. That is not to say that the events underlying the breaches of the implied covenant are not relevant to this inquiry. They would be, for example, if they were the proximate cause of or at least contributed to an unfair exchange ratio.

Turning to the ultimate question, the court finds that each of the four directors who approved the Merger did so in good faith, *i.e.*, they each subjectively believed the Merger was in Regency's best interests. This conclusion is based on the evidence discussed in detail above that forms the basis of the court's conclusion that the Merger was objectively fair and reasonable as well as the court's observations of the directors who voted to approve the Merger, each of whom testified at trial in person (Bradley, Brannon, and Bryant) or by video (Gray) and each of whom was highly credible. In sum, the record shows that the members of the Conflicts Committee firmly believed that Regency and its unitholders would be better off as part of a combined entity with ETP rather than to remain as a standalone entity given the adverse conditions in the energy markets facing the Partnership—which negatively impacted Regency far more dramatically than ETP and which were expected to

persist for years—and that securing a 15% premium for Regency's unitholders provided them fair consideration for exchanging their shares.[452]

A central focus of Plaintiff's case concerned Brannon's overlapping tenure on the Conflicts Committee and Sunoco board, and rightfully so because that overlap clearly violated the bright-line prohibition in the Qualification Provision against serving on an affiliate's board. Worse, Brannon knew during the Merger negotiations he was violating the provision and made a deliberate choice not to reach out to the Sunoco board until after the Merger was announced when it became apparent the Sunoco board had not received notice of his resignation.[453] Despite these stark facts, which Brannon forthrightly acknowledged during his testimony, the court is not convinced he acted in bad faith.

Nothing in the record suggests Brannon had an ulterior motive to avoid resigning from the Sunoco board to curry favor with Warren, to collect board fees, or to obtain any other benefit. To the contrary, he offered to resign shortly after

---

[452] *See, e.g.*, Tr. 855 (Brannon) (having "no doubt" that the Merger was in Regency's best interests); Tr. 956-58 (Bryant) (having a "pretty negative outlook for Regency" and stating as a standalone entity, Regency unitholders may not have received distributions); Tr. 565 (Bradley) (believing "it was a good deal for the Regency unitholders . . . the best deal available . . . had [Regency] continued on alone, we probably would have seen a continued decline in our unit price"); JX 815 at 203 (Gray Dep.) (stating he believed that the Merger was in Regency's best interests, in part because "the change in commodity prices, Regency's cost of capital, the street's view of Regency's prospective future . . . the only alternative if we did not do the [Merger] is basically Regency would just be in a wind-down").

[453] Tr. 869-70, 880-82 (Brannon).

Regency received ETP's initial offer on January 16, 2015, and he submitted a formal resignation letter on January 20, before any substantive negotiations concerning the Merger had begun. It was ill-advised for ETE's counsel (Mason) to be the person giving directions to Brannon about resigning from the Sunoco board. Had Brannon consulted, for example, with the Conflicts Committee's counsel, the problems with implementing his resignation may well have been avoided. Nonetheless, there is no evidence suggesting Mason had an ill-motive to flout the Qualification Provision and, once Brannon was dialoguing with Mason, it is understandable he would not disregard Mason's request to refrain from contacting the Sunoco board about his resignation until it was announced publicly in order to prevent leaks.

All in all, the process of bringing Brannon onto the Conflicts Committee was badly mishandled but it did not taint his ability to make decisions with only the best interests of Regency in mind. And, for the reasons previously discussed, whether one could view the Conflicts Committee's decision to recommend and the Board's decision to approve the Merger as objectively good or bad, the record strongly supports the conclusion that the directors who made those decisions firmly believed the Merger was in Regency's best interests.

## VIII. DAMAGES

For the reasons discussed in Part VII, the court concluded that the General Partner is not liable for monetary damages. The court next considers Plaintiff's

evidence of damages assuming, *arguendo*, that the General Partner acted in a manner that would have permitted an award of damages under Section 7.8(a) of the LP Agreement based on an express or implied breach of the LP Agreement. For the reasons discussed below, that analysis leads to the conclusion that no damages would be warranted in any event.

Plaintiff presented two theories in support of a request for an award of expectation damages—the first was the focus of Plaintiff's case at trial and the second was advanced for the first time in his post-trial brief. The court considers those two theories, in turn, below.

## A.      Plaintiff's "Give-Get" Damages Analysis

At trial, Plaintiff's valuation expert, James L. Canessa, opined that damages to the Class were $1,685,644,286—or approximately $2.2 billion when including four years of interest—by comparing (i) the value of a Regency unit as of the closing date of the Merger (April 30, 2015) based on a discounted cash flow analysis using a dividend discount model ("DDM")[454] and (ii) the value of 0.4124 ETP units using its closing stock price on April 30, 2015.[455]  In other words, Canessa's analysis is

---

[454] The dividend discount model is a variation of a discounted cash flow model, which uses expected dividends instead of projected free cash flows. JX 838 ¶ 97. In calculating the DDM value of Regency, Canessa used the January Projections, which J.P. Morgan relied on to calculate a DDM value of Regency as part of its fairness analysis. JX 477 at 1; JX 838 ¶ 100; JX 555 at 19.

[455] Tr. 235-37 (Canessa); JX 838 ¶¶ 3, 207-09, Ex. 8.

premised on an apples-to-oranges comparison of the units that were exchanged in the Merger where the "give" (Regency units) is calculated based on a *DDM valuation model* and the "get" (ETP units) is calculated based on *market price*:

| | |
|---|---|
| Give: Regency DDM value per unit | $29.06 |
| Get: ETP market value per unit ($57.78 x 0.4124) | $23.83 |
| Damages per unit | $5.23 |
| Units held by Class members | 332,208,786 |
| **Total Damages** | **$1,685,644,286** |

Canessa did not calculate a DDM value of ETP.[456] Nor did he provide any authority from finance literature to support his methodology of comparing a DDM-derived value to a market value to determine monetary damages rather than making a DDM-to-DDM or market-to-market comparison.

In response to Canessa's testimony, Defendants' valuation expert, Kevin F. Dages, presented three different analyses using two methodologies, *i.e.*, one market-to-market analysis and two variations of a DDM-to-DDM analysis. In the first analysis, Dages compared (i) the market value of a Regency unit to (ii) the market value of 0.4124 ETP units as of the announcement and closing dates of the Merger.[457] As of both dates, the market value of ETP units received in the Merger exceeded the market value of Regency's units.[458]

---

[456] Tr. 374 (Canessa).

[457] JX 842 ¶¶ 43-44; Tr. 1474-76, 1550-53 (Dages).

[458] JX 842 ¶¶ 72-74; Tr. 1474-76, 1550-53 (Dages).

In his second analysis, Dages compared (i) the implied value of 0.4124 ETP units using a DDM valuation he prepared of ETP on a *standalone basis* to (ii) the DDM valuation of Regency units Canessa prepared. This comparison showed that the DDM-derived value of ETP units received in the Merger exceeded Canessa's DDM valuation of Regency's units, whether valued as of the announcement date or the closing date and whether using the January Projections or April Projections.[459]

In his third analysis, Dages compared (i) the implied value of 0.4124 ETP units using a DDM valuation he prepared of ETP on a *pro forma* basis when combined with Regency to (ii) the DDM valuation of Regency units Canessa prepared.[460] This comparison again showed that the DDM-derived value of ETP

---

[459] JX 842 ¶¶ 10(ii), 114, 118-19; Tr. 1475, 1493-96 (Dages).

[460] The projections for ETP that Dages used for his *pro forma* analysis came from J.P. Morgan's fairness analysis and were used by ETP's financial advisor (Barclays) in its analysis. *Compare* JX 842 Ex. 13E (Dages report), *with* JX 540 at 16 (J.P. Morgan fairness analysis); *see also* Tr. 1589- 91 (Dages). Plaintiff criticizes Dages for "not assess[ing] the reliability of the *pro forma* projections he used in his DDM." Pl.'s Opening Post-Trial Br. 68. This criticism is unpersuasive. Plaintiff's own industry expert, Matthew P. O'Loughlin, used the same projections in preparing an accretion/dilution analysis, which O'Loughlin described in his report as "reasonable." Compare JX 839 ¶ 203 (O'Loughlin report), *with* JX 842 Ex. 13E (Dages report); *see also* Tr. 27-28 (O'Loughlin). As discussed below, Plaintiff used O'Loughlin's accretion/dilution analysis to create an alternative theory of damages in his post-trial brief. That analysis utilizes the *pro forma* cost of equity for the combined entity that Dages calculated. *See* Pl.'s Opening Post-Trial Br. 69.

116

units received in the Merger exceeded Canessa's DDM valuation of the Regency's units, whether valued as of the announcement date or the closing date.[461]

In sum, Dages' analyses showed that every apples-to-apples comparison (market-to-market or DDM-to-DDM) demonstrated that members of the Class suffered no damages and that the only way Canessa could attest to the existence of damages was by making an apples-to-oranges comparison of a DDM-valuation of Regency's units to the market price of ETP's units. As Canessa conceded:

> Q.    Now, the reason for that is because the only way you get damages in this case is if you compare Regency's DDM that you did to ETP's market price; right?
>
> A.    That is correct, yes.
>
> Q.    If the – if you compare market price to market price on sign or on close, there's no damage; right?
>
> A.    That's correct.
>
> Q.    And if you compare DDM to DDM for Regency and EPT on sign and close, there's no damage, right?
>
> A.    That's correct.

---

[461] JX 842 ¶¶ 10(ii), 122-24; *Compare* Tr. 1499-1500 (Dages) (*pro forma* DDM as of sign or close is $31.24 or $30.39, respectively), *with* Tr. 1573, 1577 (Dages) (Canessa's DDM valuation of $30.42 as of signing and $29.06 as of closing).

Q.      And it doesn't matter – I want to be real clear on that answer. On the Regency side, it doesn't matter whether you use the January projections, the February projections, the March projections, or the April spreadsheet; right?

A.      That's correct.[462]

The chart below depicts the results of each of the analyses Canessa and Dages performed using the January Projections:[463]

| Valuations Input: | Market Price ($/unit) | | Dividend Discount Model ($/unit) Based on January 2015 Projections | |
|---|---|---|---|---|
| Valuation Date | 1/25/2015 | 4/30/2015 | 1/25/2015 | 4/30/2015 |
| **Canessa** | | | | |
| Merger Consideration | $26.89 | $23.83 | ---- | ---- |
| Regency standalone value | ---- | ---- | $30.42 | $29.06 |
| **Dages** | | | | |
| Merger Consideration | $26.89 | $23.83 | $30.95 | $30.10 |
| Regency standalone value | $23.75 | $23.75 | $28.74 | $28.02 |
| **Dages** | | | | |
| Pro Forma Consideration | N/A | N/A | $31.24 | $30.39 |
| Regency standalone value | N/A | N/A | $28.74 | $28.02 |

Plaintiff argues that the DDM-to-market comparison in Canessa's damages model is a valid valuation methodology on the theory that ETE had a "financial incentive to favor ETP over Regency" based on the difference between their

---

[462] Tr. 363-64 (Canessa).

[463] JX 842 ¶¶ 10, 44, 74, 116-21; JX 838 Ex. 8.

118

respective IDR splits,[464] which "caused Regency's unit price to suffer a 'valuation overhang.'"[465] Although it is true that ETE had a contractual right to share in a higher percentage of the distributable cash flows of ETP than it did for Regency before the Merger,[466] Canessa did not provide any empirical support indicating that ETE actually favored ETP over Regency in the past, and the record shows otherwise.

Contrary to Canessa's theory, the record shows that Regency grew through acquisitions at a "slightly faster" rate than ETP during the three-year period preceding the Merger and that ETE provided financial support for certain Regency acquisitions by, among other things, forgiving IDR payments and suspending management fees.[467] Analyst reports on which Canessa relied in rendering his opinions recognized that "ETE has shown it can be supportive [of Regency] during

---

[464] As discussed in Part I.D, *supra*, as of the end of the fourth quarter of 2014, the IDRs that ETE owned entitled it to receive 48% and 23%, respectively, of ETP and Regency's incremental quarterly distributions (*i.e.*, distributions above a specified level), although Regency was close to reaching the 48% tier in its IDR schedule.

[465] Pl.'s Opening Post-Trial Br. 67. Plaintiff also contends that "Regency's unaffected unit price did not reflect Regency's value as of January 2015" based on Welch's unauthorized comments at the Wells Fargo energy symposium in December 2014. *Id.* As discussed above, it is not disputed that these comments (although unauthorized) were accurate. The comments, furthermore, were preceded by a substantial decline in Regency's unit price over the nine trading days since the OPEC announcement and were in the public domain for more than a month before the announcement of the Merger. *See supra* Part VI, Finding #4.

[466] *See supra* Part I.D.

[467] Tr. 1481-85 (Dages).

119

transactions" and that "we have witnessed little conflict as we note that both ETP and RGP have grown."[468]  Plaintiff's own brief acknowledges as much:

> Regency was rapidly growing its business, embarking on major acquisitions and growth projects.  Between 2013 and 2014, Regency engaged in $9 billion of acquisitions and spent $1.5 billion on growth initiatives.[469]

To be clear, the evidence of Regency and ETP's acquisition history does not rule out the possibility of a "valuation overhang" due to control.  It simply supports the point that to the extent a valuation overhang due to ETE control existed, there is no basis to conclude that it affected Regency differently than ETP.  Indeed, the record bears out that that the general partner powers, SEC risk disclosures regarding conflicts, and analyst commentary regarding ETE control are substantively the same for both Regency and ETP.[470]

Given the lack of any empirical support for drawing a distinction between Regency and ETP based on a valuation overhang theory, Canessa's use of a DDM-to-market comparison is illogical and at odds with well-established Delaware precedent rejecting similar attempts to utilize apples-to-oranges comparisons to justify damages in actions challenging the fairness of stock-for-stock mergers.

---

[468] Tr. 422-26 (Canessa); JX 96 at 6; JX 211 at 3.

[469] Pl.'s Opening Post-Trial Br. 8 (citations omitted).

[470] Tr. 1489-91 (Dages); JX 842 ¶¶ 82-84.

Almost seven decades ago, in *Sterling v. Mayflower Hotel Corp.*, the Delaware Supreme Court summarily rejected a damages analysis comparing "the *market* value of the parent stock issued to the stockholders of the subsidiary" to the "*liquidating* value of the subsidiary's stock."[471] Not mincing words, the high court found that the analysis was "[o]n its face . . . unsound, since it attempts to equate two different standards of value" and that the plaintiffs' position was "wholly untenable."[472]

The Court of Chancery has followed *Sterling's* common-sense reasoning on numerous occasions. For example, in *Rosenblatt v. Getty Oil Co.*, which involved a class action challenging the fairness of Getty's acquisition of Skelly Oil Company in a stock-for-stock merger, Chancellor Brown rejected the argument of plaintiff's expert that "fairness required the Skelly minority shareholders to receive Getty stock having a *market* value equal to the *asset* value of their Skelly stock."[473] The court explained that the expert's position was "basically . . . the same argument that was rejected in *Sterling* v. *Mayflower Hotel Corp.*"[474]

---

[471] 93 A.2d 107, 111 (Del 1952).

[472] *Id.* at 111, 113.

[473] 1983 WL 8936, at *26 (Del. Ch. Sept. 19, 1983) (emphasis added), *aff'd*, 493 A.2d 929 (Del. 1985).

[474] *Id.*

Similarly, in *Citron v. E.I. DuPont de Nemours & Co.*, which involved a class action challenging DuPont's acquisition of its subsidiary (Remington Arms Company) in a stock-for-stock merger, then-Vice Chancellor Jacobs rejected an analysis of plaintiff's expert that was "akin to comparing apples to oranges."[475] More specifically, the court found that a valuation of Remington that "compared "Remington's *adjusted book value* to DuPont's stock *market price*, rather than valuing DuPont and Remington shares in the same manner and then comparing those values" had "no probative value."[476]

More recently, in *Emerald Partners v. Berlin*, which also involved a class action challenging a stock-for-stock merger, the court found that an analysis of plaintiff's expert that compared "an *undiscounted* going concern value as of one of one date, to a *discounted* going concern value as of a later date" was "flawed because it compares apples to oranges."[477]

In the face of this precedent, Plaintiff relies essentially on one case: *In re Southern Peru Copper Corp. Shareholder Derivative Litigation*.[478] There, a stockholder of Southern Peru, a publicly-traded company controlled by Grupo

---

[475] 584 A.2d 490, 492 (Del. Ch. 1990).

[476] *Id.* at 509 (emphasis added).

[477] 2003 WL 21003437, at *36 (Del. Ch. Apr. 28, 2003), *aff'd*, 840 A.2d 641 (Del. 2003).

[478] 52 A.3d 761 (Del. Ch. 2011), *aff'd sub nom. Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012).

Mexico, asserted that the company overpaid when it acquired 99.15% of Minera—

a private company also controlled by Grupo Mexico—for the price the controller

demanded, *i.e.*, 67.2 million newly-issued shares of Southern Peru stock with a

signing-date market value of $3.1 billion.[479] The case is readily distinguishable.

The gravamen of the trial court's detailed analysis was that the transaction

was unfair because, rather than working to ensure that Southern Peru received

equivalent value for its 67.2 million shares—which "everyone believed" were worth

$3.1 billion in cash,[480] the special committee and its financial adviser "went to

strenuous lengths to equalize the values of Southern Peru and Minera" to benefit the

controller through a series of analyses based on unreliable data that "devalued

Southern Peru and topped up the value of Minera," a private company.[481] Here,

---

[479] *Id.* at 764-75.

[480] *Id.* at 763 ("The 3.1 billion was a real number in the crucial business sense that everyone believed that the NYSE-listed company could in fact get cash equivalent to its stock price for its shares.").

[481] *Id.* at 801. It is in this context that the court rejected defendants' "relative valuation" of Southern Peru and Minera using DCF values where "the cash flows for Minera were optimized to make Minera an attractive acquisition target, but no such dressing up was done for Southern Peru." *Id.* at 802. On appeal, after carefully examining the record, the Supreme Court explained that the Court of Chancery's "rejection of Defendants' 'relative valuation' of Minera was the result of an orderly and logical deductive process that is supported by the record." *Ams. Mining*, 51 A.3d at 1247. The high court explained that the "Court of Chancery acknowledged that relative valuation is a valid valuation model," that a DCF model "is only as reliable as the input data used for each company," and that the trial court "carefully explained its factual findings that the data inputs . . . used for Southern Peru in the Defendants' relative valuation model for Minera were unreliable." *Id.* at 1247-48.

unlike in *Southern Peru*, Regency and ETP were both publicly traded in efficient markets[482] and there is no evidence that J.P. Morgan manipulated any of its valuation analyses or that the Conflicts Committee eschewed market evidence of Regency's value in favor of a lower valuation based on a DDM or some other financial model. Indeed, Canessa concedes that Regency traded in an efficient market[483] and he used the same January Projections in his DDM that J.P. Morgan used in its fairness opinion valuation analysis.

In sum, for the reasons explained above, the court finds that Canessa failed to provide a valid rationale for valuing the Merger consideration based on DDM-to-market comparison and that his damages analysis is unreliable and is accorded no weight because it illogically "attempts to equate two different standards of value."[484] As Dages testified and as the chart depicted above shows, when one conducts a market-to-market or DDM-to-DDM comparison of the give and get in the Merger, there are no damages.

---

[482] JX 842 ¶ 34.

[483] Tr. 424 (Canessa).

[484] *Sterling*, 93 A.2d at 111; *see also LongPath Cap., LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443, at *1 (Del. Ch. June 30, 2015) (rejecting damages model when data inputs are unreliable); *Highfields Cap., Ltd. v. AXA Fin.*, 939 A.2d 34, 56-58 (Del. Ch. 2007) (Lamb, V.C.) (giving no weight to unreliable comparable company methodology).

## B. Plaintiff's Dilution Damages Analysis

Tacitly acknowledging the methodological flaw in Canessa's damages analysis that became very apparent at trial, Plaintiff presented for the first time in its post-trial brief an alternative "damages" theory. The theory begins with a calculation Plaintiff's industry expert (O'Loughlin) presented at trial that, according to Plaintiff, "quantified the amount of Regency's cash flows Defendants diverted through the Merger to ETE" from 2015 to 2019, which "diluted the distributions to Regency unitholders."[485] O'Loughlin's calculations are set forth below. The bottom row ("Aggregate Merger Impact") is the total amount of distributions allegedly diverted from the Class to ETE post-Merger over five years in undiscounted dollars:

| | | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| Stand-alone RGP LP DPU | | $2.01 | $2.07 | $2.17 | $2.25 | $2.33 |
| | | | | | | |
| Merged Entity LP DPU | | $4.18 | $4.45 | $4.68 | $4.85 | $5.05 |
| RGP ETP Unit Exchange Ratio | × | 0.4124 | 0.4124 | 0.4124 | 0.4124 | 0.4124 |
| Effective DPU for Legacy RGP LP Unitolders | | $1.72 | $1.84 | $1.93 | $2.00 | $2.08 |
| | | | | | | |
| | | $1.72 | $1.84 | $1.93 | $2.00 | $2.08 |
| | − | $2.01 | $2.07 | $2.17 | $2.25 | $2.33 |
| Merger Impact on Legacy RGP LP Units ($/unit) | | ($0.29) | ($0.23) | ($0.24) | ($0.25) | ($0.24) |
| Merger Impact (%) | | -14% | -11% | -11% | -11% | -10% |
| | | | | | | |
| Merger Impact ($/unit) | | ($0.29) | ($0.23) | ($0.24) | ($0.25) | ($0.24) |
| Legacy Public RGP LP Units at Merger (Millions) | × | 321 | 321 | 321 | 321 | 321 |
| **Aggregate Merger Impact ($ millions)** | | ($92) | ($73) | ($78) | ($80) | ($78) |

---

[485] Pl.'s Opening Post-Trial Br. 68.

In his opening post-trial brief, Plaintiff discounted the figures in the bottom row to present value using the cost of equity Dages' utilized at trial in his *pro forma* DDM model.[486] According to Plaintiff, this calculation "establishes damages between $1.049 per unit (cost of equity with size premium) and $1.0538 (cost of equity without size premium), respectively—totaling $337,997,017 and $339,543,619, respectively, for the unaffiliated units outstanding at the time of the Merger."[487]

Defendants argue Plaintiff went all-in at trial with Canessa's $1.6 billion plus give-get damages analysis and waived the right to present a different theory after trial.[488] They have a valid point.[489] O'Loughlin was not identified as a damages expert before trial and admitted during trial he was "not providing an amount by which the Court should enter judgment."[490] Had O'Loughlin presented Plaintiff's newfound theory at trial, he (and Canessa) would have faced some hard questions that Defendants were never afforded the opportunity to ask—like how one

---

[486] *Id.* at 69.

[487] *Id.*

[488] Defs.' Post-Trial Br. 85.

[489] *See Fletcher Int'l, Ltd. v. Ion Geophysical Corp.*, 2013 WL 6327997, at *16, *21 (Del. Ch. Dec. 4, 2013) (disregarding "new damages theory" raised for the first time in post-trial brief "after the viability of theory [asserted at trial] was undercut at trial"); *Zaman v. Amedeo Hldgs., Inc.* 2008 WL 2168397, at *16 (Del. Ch. May 23, 2008) (finding waiver of argument first raised in post-trial brief).

[490] Tr. 208 (O'Loughlin) ("All I'm doing is an analysis of the distributions.").

analytically can reconcile two different damages methodologies that quantify the same supposed harm to Regency unitholders but reach vastly different results. Putting aside that Plaintiff's dilution theory was not fairly raised, it suffers at least two obvious deficiencies that convince the court it is unreliable and must be rejected.

First, as the court has found, the historic decline in energy prices that began in 2014 impacted ETP and Regency in dramatically different ways due to the nature of their businesses, their respective sensitivity to commodity prices, and their respective financial strength.[491] Yet Plaintiff's dilution calculation assumes that the projected distributions from ETP and from Regency were "equally likely to be achieved" and fails to account for their differing risks.[492] That methodological flaw makes the calculation plainly unsound.[493] Indeed, the DDM-to-DDM comparison discussed above shows that, when accounting for risk, the value of the Merger consideration (based on ETP's *pro forma* future distributions) exceeded the value of Regency's as a standalone entity (based on its future distributions), yielding zero damages.

---

[491] *See supra* Part VI Finding #2; Tr. 735-36 (Castaldo); Tr. 388-89 (Canessa) ("Q: ETP was more stable than Regency. Right? A: Yes.").

[492] Tr. 207 (O'Loughlin).

[493] *El Paso*, 2015 WL 1815846, at *26-27 ("Arriving at an accurate valuation . . . requires an assessment of the reliability of . . . future cash flows.") (rejecting an expert's valuation that did not consider risk to entity's future cash flows).

Second, Plaintiff's dilution calculation does not consider other benefits the unitholders received from the Merger. In particular, the analysis does not take into account the 15% ($3.14/unit) premium that was achieved based on the companies unaffected unit prices as of the announcement date of the Merger, which substantially exceeds the $1.05/unit in damages that Plaintiff projects.

## IX. CONCLUSION

For the reasons explained above, judgment will be entered in favor of Defendants and against Plaintiff on Counts I and II of the Amended Complaint. Each party will bear its own costs. The parties are directed to confer and submit an implementing form of final judgment consistent with this decision within five business days.